## KEYSTONE AUTOMOBILE CLUB v. COMMISSIONER OF INTERNAL REVENUE.

### No. 10097.

United States Court of Appeals
Third Circuit.

Argued Feb. 23, 1950.

Decided March 30, 1950.

R. Lester Moore, Philadelphia, Pa. (Todd Daniel, Philadelphia, on the brief), for petitioner.

Sumner M. Redstone, Washington, D. C. (Theron Lamar Caudle, Assistant Attorney General, Ellis N. Slack, Special Assistant to the Attorney General, on the brief), for respondent.

Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.

GOODRICH, Circuit Judge,

The question in this case is whether the Keystone Automobile Club must pay federal income taxes for the year 1943. The Club says that it does not have income. It also says that it is exempt under Section 101(9) of the Internal Revenue Code, 26 U.S.C.A. § 101(9). The wording of this section will be discussed later. The Commissioner's assertion of tax liability was upheld by the Tax Court.[1] The taxpayer seeks a reversal of that decision here.

There are two aspects to the case and we think it will make for clearness in their treatment if we discuss them separately. One has to do with whether, as an original proposition, the Keystone Club comes under the exemption statute. The second aspect of the case has to do with the effect of what is claimed to be a long history of administrative action applying the exemption to this and similar organizations.

We turn first to the statute and the question of exemption without regard to administrative rulings. The pattern of activity of Keystone does not differ greatly from that of other automobile organizations recently involved in this same type of litigation. Keystone was organized in 1906 as The Automobile Club of Delaware County and was incorporated in 1911 as a Pennsylvania non-profit, non-stock corporation. It now operates in Eastern Pennsylvania, the District of Columbia, part of New Jersey, Maryland and Virginia. But it also has arrangements whereby its members may procure the benefit of membership through services obtained outside these areas. Members are entitled to emergency road service, touring advice and maps, bail bond service and assistance in securing licenses and having applications notarized. Keystone is the sole owner of the stock of two insurance companies and these companies, in turn, sell policies on motor vehicles and fire insurance on homes to members of Keystone. There is also a finance corporation through which members may finance payments on cars they purchase. These wholly owned corporations pay income taxes on their earnings. The inducement to members of Keystone to do business with them is that members secure the services offered by these companies at lower net cost than they could obtain them elsewhere. Further facts about the nature and operation of the taxpayer will be stated as the discussion proceeds.

The paragraph of the statute under which exemption is claimed here (Section 101[9]) exempts: "(9) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder."

We are very skeptical whether Keystone has any features of a club except the word used as part of its corporate name. What is a club? Unless the term has become one of art in the law we do not think a consultation with law dictionaries to be helpful. We do not think it is a term of art and find no evidence that Congress was not

1. 12 T.C. 1038 (1949).

using the word as any of us would in common parlance. The dictionary definition perhaps may help to center attention on the use of the term in ordinary speech; it talks about a club as "an association of persons for the promotion of some common object."[2]

We have no doubt that the concept of a club is a broad one. It can include persons who get together to eat and drink and to sing afterwards, but it certainly is not limited to that. On the other hand, a group of people with a common object may, quite clearly, not constitute a club. A crowd of shoppers trying to get at a counter where a sale is taking place is certainly a group of people with a common object, but we feel sure that even the petitioner would not call such a group a club. We think that the dictionary represents the common concept that there must be some type of mingling of people together, as well as a common object, to constitute that vague thing known as a club.

What about Keystone in the light of this general approach? Back in 1911 when the charter was granted, the purpose was stated as "to maintain a club for social enjoyment, and a club house, and for the comfort, protection and convenience of its members in the pursuit of the pastime of automobiling." In 1911 there were about 618,000 passenger cars registered in the United States as compared with something more than 33,-000,000 in 1948.[3] It may well be at that time car owners did club together for their common interests. Whether Keystone ever had a club house the record does not disclose. But there is an interesting indication in one of the recent cases concerning motor clubs that the club of Minneapolis, Minnesota, had and still does maintain a country club house for its members.[4]

Keystone has quarters where it transacts business. These quarters are not a club house in the sense of being a center of social activity. Nor does Keystone conduct or furnish facilities for conducting any social functions whatever. And so far as "the pastime of automobiling" is concerned there is nothing to show that Keystone's members, or how many of them, use their cars for the pastime of automobiling. The organization does not check to see whether a member, present or prospective, uses his car commercially or for pleasure only or both. It is difficult for us to think that the 48,010 members of Keystone Automobile Club in 1943 used their cars as a "pastime."

The securing of new members for Keystone does not seem to us to be done in a club-like manner. It appears that during the tax year 1943 Keystone paid some $40,-000 in commissions to solicitors who had secured persons to join. In other words, here is a type of out and out solicitation, a perfectly legitimate business, but hardly fitting in with the conduct of a club.

We do not see in the evidence shown as to the operation of Keystone and the services performed anything which members do together. There is a provision for an annual meeting and the election of officers. Not without significance is the provision that 25 members constitute a quorum. The other services rendered, which have already been outlined, are no doubt highly valuable and we have no question as to the efficiency of operation. But they are commercial services pure and simple and the fact that people save each other money by employing a common agent from whom to procure these services does not make them club members, even in the loosest sense of that term.

But if we assume that Keystone is a "club" where do we get as to its exemption under the statute? We have been treated to a good sized dose of so-called canons of construction known as noscitur a sociis and ejusdem generis in connection with the argument. We find them just about as helpful in settling a specific case as those vials of distilled wisdom of the ages containing the phrases "birds of a feather flock together" and "a man is known by the company he keeps." Throwing a vague

---

2. Webster's New International Dictionary, Unabridged (2d ed. 1939).
3. Automobile Facts and Figures, p. 21 (Automobile Mfrs. Assn., 29th Ed. 1949).
4. The Automobile Club of St. Paul, 12 T.C. 1152 (1949).

phrase into law Latin does not make it any more useful in construing a statute.

▉ Keystone says the Commissioner insists that the exemption phrase be read as though the word "similar" appeared between the word "other" and the word "nonprofitable," as though the statute read "Clubs organized * * * for pleasure, recreation, and other *similar* non-profitable purposes." The taxpayer says that that is incorrect; that "nonprofitable" means what it says and that Keystone is a nonprofit corporation and organized as such under the Pennsylvania law. The best answer to the taxpayer is to take a look at all of Section 101 with its nineteen paragraphs, each exempting particular types of organizations. We shall not list them all but call attention to the fact that number (1) exempts labor, agricultural, or horticultural organizations; number (3) exempts fraternal beneficiary societies; number (6) takes out such exemptions as community chests, literary, educational and scientific organizations; number (7) takes out business leagues and chambers of commerce; number (8), employees' associations. If the construction of number (9) contended for by the taxpayer is right, Congress has thrown in a lot of unnecessary and confusing classifications in other paragraphs of this section. It seems pretty clear to us that in paragraph number (9), here involved, Congress was talking about one type of organization among individuals which was, on the whole, different from the types talked about in the other paragraphs of this section. We think, therefore, that the Commissioner is right.

▉ The taxpayer also says that its entrance fees and dues are not income within Section 22(a) of the Internal Revenue Code, 26 U.S.C.A. § 22(a). We have listened to this point being argued and we have read it in type several times. But still it makes no impression on us. If Keystone is otherwise taxable we think it quite clear that its membership fees and dues are the price which its members pay for the services rendered.

Administrative History And Reenactment

The exemption section of the statute here concerned has been substantially unchanged since 1916.[5] Since that time there have been eight income tax statutes reenacting this paragraph, the codification of 1939 and two amendments to Section 101 of the Code. Now we come to what seems to us the only difficult point of this case. Keystone has not been called upon to pay income taxes up to the year 1943.[6]

The exemption through the years came to Keystone and others not through a general regulation but through certain memoranda from the Commissioner's office dealing with individual exemptions in specific cases. These began back as early as 1920.[7]

▉ Add to these facts the legal doctrine that when Congress reenacts a statute it is taken to be reenacted with the encrustation of the administrative rulings upon it.[8] This

5. Revenue Act of 1916, § 11 (a) (9), 39 Stat. 766.

6. G.C.M. 23,688, 1943 Cum.Bull. 283. No attempt has been made to give retroactive effect to the 1943 ruling, and that ruling has been characterized as "an extended and well considered opinion" in 6 Mertens, The Law of Federal Income Taxation 63 (1948).

7. Automobile clubs were granted tax immunity by O.D. 643, 3 Cum.Bull. 241 (1920). That ruling was followed by G.C.M. 2867, VII-1 Cum.Bull. 115 (1928); G.C.M. 3555, VII-1 Cum.Bull. 117 (1928). All these were revoked by G.C.M. 23,688, supra.

8. See American Chicle Co. v. United States, 1942, 316 U.S. 450, 62 S.Ct. 1144, 86 L.Ed. 1591; Helvering v. Reynolds, 1941, 313 U.S. 428, 61 S.Ct. 971, 85 L.Ed. 1438, 134 A.L.R. 1155. In those cases, the reenactment doctrine is looked upon as no more than an aid in statutory construction. Compare Helvering v. R. J. Reynolds Co., 1939, 306 U.S. 110, 115, 59 S.Ct. 423, 426, 83 L.Ed. 536: "Under the established rule Congress must be taken to have approved the administrative construction and thereby to have given it the force of law." The doctrine is discussed in Griswold, A Summary of the Regulations Problem, 54 Harv.L.Rev. 398 (1941); Paul, Studies in Federal Taxation 420 (3d Series 1940); Surrey, The Scope and Effect of Treasury Regulations under the Income, Estate and Gift Taxes, 88 U. of Pa.L.Rev. 556 (1940); 1 Mertens, op. cit. supra §§ 3.22–3.24 (1942).

is no Latin maxim to be bowed out in a moment of impatience, but a doctrine which has repeatedly been called to the attention of Courts of Appeals, especially when applied on behalf of the Commissioner.

█ There are two answers, we think, to make to the argument that it controls here. The first is technical, but no more technical than the doctrine against which it is advanced. In this instance we do not find that the administrative current of decision is as unruffled as citation of the rulings above would indicate. From the very beginning treasury regulations have interpreted Section 101(9) as applicable to social clubs and social clubs only.[9] The Commissioner urges upon us that these regulations are higher in the administrative hierarchy than memoranda coming from his office. The order of rank among administrative agencies making tax rulings is one we should like to avoid assigning if we can. We can avoid it here. The point is that there is concurrently with rulings exempting individual automobile organizations a consistent treasury policy maintained throughout the existence of Section 101(9) confining that paragraph to social clubs.

If we assign to the Congress full knowledge of administrative rulings upon each enactment of this law, just what do we impute to that body here? Does it know both the treasury regulations and the rulings from the Commissioner's office? If it knows both, which does it have in mind in reenacting the section without change? We think that here is an instance where the two, at the very least, cancel each other and should not create an obstacle for the Commissioner or the courts in approaching the section unclouded by administrative precedent.

Unless the Commissioner is compelled to abide by a former ruling, we see no reason why he should not be allowed to change his mind here. There were more than seven times more passenger cars registered in 1943 than in 1916.[10] We have not the figures on automobile clubs, except for Keystone. Its membership has jumped from 48,010 in 1943 to 88,000 in 1948. The years since the first statutory exemption for social clubs have seen the motor vehicle change from a means of amusement for the well-to-do to a practically universal means of transportation. If the Commissioner cannot change his mind about the relative place of automobile owners in the scheme of things during that period, he is the only human being in America so precluded. We think that the facts of automobile life indicated the change which was made and the Commissioner was right in making it.

This subject-matter is evidently being litigated country-wide. There have been four cases in the Tax Court, of which the Commissioner has won all.[11] The Ninth Circuit has, likewise, agreed with him.[12] We agree also.

The decision of the Tax Court will be affirmed.

---

9. The current regulation is U.S.Treas.Reg. 111, § 29.101(9)-1: "Social clubs.—The exemption granted by section 101(9) applies to practically all social and recreation clubs which are supported by membership fees, dues, and assessments. If a club engages in traffic, in agriculture or horticulture, or in the sale of real estate, timber, etc. for profit, such club is not organized and operated exclusively for pleasure, recreation or social purposes. Generally, an incidental sale of property will not deprive the club of the exemption."

The regulation dates back to U.S.Treas. Reg. 33, Art. 72 (1918), which was promulgated under the Revenue Act of 1916. It has always borne the heading "Social club" and the text of the regulation has undergone little change.

10. There were 3,367,889 passenger cars registered in the United States in 1916; in 1943, the total was 25,912,730. Automobile Facts and Figures, supra, p. 12. Half of the nation's families now own at least one car. 35 Fed. Reserve Bull. 335 (1949).

11. Automobile Club of St. Paul, 12 T.C. 1152 (1949); Keystone Automobile Club, 12 T.C. 1038 (1949); Chattanooga Automobile Club, 12 T.C. 967 (1949); Warren Automobile Club, 8 T.C.M. — (June 14, 1949).

12. Smyth v. California State Automobile Association, 9 Cir., 1949, 175 F.2d 752.