**CHATTANOOGA AUTOMOBILE CLUB v. COMMISSIONER OF INTERNAL REVENUE.**

**WARREN AUTOMOBILE CLUB, Inc. v. COMMISSIONER OF INTERNAL REVENUE.**

Nos. 11017, 11016.

United States Court of Appeals
Sixth Circuit.
June 1, 1950.

552

John Ross Scott, Chattanooga, Tenn. (John Ross Scott, Chattanooga, Tenn., on the brief), for Warren Automobile Club, Inc.

Carl H. Tangeman, Columbus, Ohio (I. G. Stirgwolt, Columbus, Ohio, Vorys, Sater, Seymour & Pease, Columbus, Ohio, on the brief), for Chattanooga Automobile Club.

Irving I. Axelrad, Washington, D. C. (Theron Lamar Caudle, Ellis N. Slack, and Sumner M. Redstone, Washington, D. C., on the brief), for respondent.

Before SIMONS, MARTIN and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

In both these cases, the petitioners seek review and reversal of decisions of the United States Tax Court upholding determinations by the Commissioner of Internal Revenue of deficiencies in income tax and declared value excess-profits tax for their respective fiscal years ending during 1944. Though argued and submitted separately, the controlling issue in each case is the same. We will, therefore, announce decision in both cases in one opinion.

Both the Chattanooga Automobile Club and the Warren Automobile Club, Inc.,

were incorporated many years ago as non-profit corporations under the respective laws of Tennessee and Ohio. Each claims exemption under section 101(9) of the Internal Revenue Code, 26 U.S.C.A. § 101(9), which provides: "The following organizations shall be exempt from taxation * * * (9) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder". There is presented to us the crucial question: Was either petitioner within the meaning of this section a club organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes? The Tax Court of the United States, four judges dissenting in the Chattanooga Automobile Club case, answered: "No". To determine the accuracy of this answer, we must examine the facts concerning each corporation's undertakings and activities.

Both petitioning corporations were affiliated with the American Automobile Association, one as a member, the other as a member of a member; both were organized as nonprofit corporations; and neither paid any dividends nor made any distribution of profits to its members. Each charged low annual dues, for which its members were entitled to numerous services and benefits. The respective corporations made contracts with garages for towing and emergency road service. Each furnished its membership with maps, routings, and free tourist and road information; and each procured automobile licenses for its members without charge and furnished free notarial service in connection therewith. Each offered a $25 theft reward covering any car stolen from a member and furnished its members bail bond up to $5,000, Warren advertising: "Our Members Get Bail—Not Jail". Each furnished its members with a $1,000.00 personal automobile accident policy, with weekly indemnity. Free emergency lock and key service was also furnished to members by both clubs. The services to the members of each corporation were substantially the same, those of Warren being a bit broader in scope. Affiliation with the American Automobile Association gave the service benefits to the members of the two clubs wherever they might be traveling throughout the United States. The aforementioned and kindred services to its members constituted the foremost function of the clubs.

It is true that public services were undertaken and performed by both Chattanooga and Warren, such as sponsorship of school safety patrol and drivers' training in the schools; promoting and publicizing safety measures; furnishing some traffic and road signs; and sponsoring laws beneficial to automobile travel. But it cannot be said, upon the whole record in the two cases, that such public services were primary in the purposes of the two organizations. Membership in the clubs was restricted to owners of passenger automobiles, most of whom used them for pleasure but some of whom used them for business purposes also. Qualification for membership was most democratic. Memberships were solicited by agents, who were paid a commission for each one sold. The Warren corporation, which had some two thousand members, paid $3,600 in commissions during the taxable year involved; and the Chattanooga corporation, which had 397 resident members paid $363.60 in commissions during its taxable year. The former corporation collected $21,705 and the latter $4,275, in membership fees, during their respective taxable years.

Both corporations had officers; Chattanooga had directors; and Warren had trustees. Chattanooga paid no compensation to its officers and directors. Luncheons served at its directors' meetings were furnished at the cost of the club. It had only one employee who was paid $1,394.80 during the taxable year. It occupied no club house, but only a small space in the Hotel Patten at Chattanooga where it transacted business. The Warren corporation paid its manager $3,475, office salaries of $4,234.35, and fees to its trustees in the amount of $765, during the taxable year. It, likewise, had no clubhouse, but occupied a single room or hall, approximately 15 x 70 feet, wherein all its personnel and equipment were located.

554

The only substantial difference in the operation of the two clubs was that the entire revenue of Chattanooga, except service charges received from affiliated automobile clubs, came from membership dues, while Warren received from non-members fees in the amount of $6,695.92 for issuing licenses. The net profit on this business, however, was $4,597.05, for the cost of performing license-service to non-members totalled $2,098.87. The Warren corporation also received $471.75 in notary fees from non-members.

■ Did congress intend that corporations of the type of petitioners, whose objectives and activities have been succinctly described, should be exempt from taxation under section 101(9) of the Internal Revenue Code? We think not. To be exempt under the Act of Congress, a club must have been organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, with none of its earnings inuring to the benefit of its membership, It is our thought that there must be at least some sort of commingling of members to constitute a club which is exempted by subsection 9 of section 101 of the Internal Revenue Code. There are doubtless more different kinds of clubs than there are clubs in a deck of cards. Some clubs are highly profitable enterprises, such as night clubs, professional baseball and football clubs and jockey clubs, which do not fall within the exemption. Some clubs feature exclusively the intellectual, or artistic; some amateur athletics and sports; and others the epicurean, terpsichorean, or social side: all falling clearly within the exemption clause of the tax statute.

As early as 1670, our English cousins had the notion that a club is an "association of persons meeting periodically (under certain regulations), at some house of entertainment, for social intercourse, etc." Shorter Oxford English Dictionary, Vol. I, page 329. Several different definitions of a club are found in Webster's authoritative American work. We think he, too, emphasized commingling of membership in one of his definitions of a club as "an association of persons for the promotion of some common object, as literature, science, politics, goodfellowship, etc., esp. one jointly supported and meeting periodically." He added: "Membership is usually conferred by ballot, and carries the privilege of exclusive use of a club building or apartment." Webster's New International Dictionary, 1924 Ed., page 422.

The members of these two automobile clubs certainly did not commingle. Neither club had a club house, but only an office for the transaction of its business, not designed for meetings of the entire membership. There was only an annual meeting for members, attended by but a few, to elect directors of the Chattanooga club and trustees for the Warren club. Obviously, in paying the price for original membership and in subsequently paying $10 annual dues, no person had in mind that he would associate personally with others for any social, civic, political, business, or any other purpose. He was merely banding with other people to purchase at a reduced cost services in connection with the use of his automobile. These services to members were performed entirely by paid employees. Amounts expended by the clubs for general welfare service were quite insignificant when compared to expenditures for rendering services to club members.

■ The petitioners contend that the words "other nonprofitable purposes" should not be construed as the Commissioner of Internal Revenue construed them to mean nonprofitable purposes *similar* to purposes of pleasure and recreation. This argument overlooks the fact that preceding subsections of section 101 of the Internal Revenue Code specifically exempt nonprofit organizations operated for literary, educational, scientific, charitable, or religious purposes, chambers of commerce, business and civic leagues, and other specified eleemosynary institutions. Were the insistence of the petitioners accepted, many of these specific exemptions would be mere surplusage, inasmuch as they would fall within the sweep of the expression "other nonprofitable purposes" contained in subsection 9. We think the words "other nonprofitable purposes" carry in the context a plain connotation that the purposes must be

construed as coming within the same classification as pleasure and recreation. The services rendered by each club were in part to automobiles used for business purposes and, therefore, not operated "exclusively" for pleasure, recreation, and other similar purposes.

There is no merit whatever in the argument that the petitioners should be exempted from taxation as business leagues under section 101(7), or as civic leagues under section 101(8), of the Internal Revenue Code. The petitioners cannot classify as business leagues, for their membership is not limited to business men. Any one of good reputation owning a passenger car may join. Nor can petitioners be exempted from taxation as civic leagues, for neither is "operated exclusively for the promotion of social welfare."

The argument is made on behalf of petitioners that former long-standing rulings of the Bureau of Internal Revenue exempted automobile clubs from taxation, and that the repeated reenactment by Congress of section 101(9) indicated that Congress approved the exemption. This same argument was rejected recently upon sound reasoning by the Court of Appeals for the Third Circuit in Keystone Automobile Club v. Commissioner of Internal Revenue, 3 Cir., 181 F.2d 402. See also Smyth v. California State Automobile Ass'n, 9 Cir., 175 F.2d 752.

The rulings relied upon by petitioners were not even Treasury Regulations of general applicability, but were mere departmental rulings, general counsel memoranda, and office decisions. The Supreme Court in Biddle v. Commissioner, 302 U.S. 573, 582, 58 S.Ct. 379, 383, 82 L.Ed. 431, stated that "departmental rulings not promulgated by the Secretary [of the Treasury] are of little aid in interpreting a tax statute". The court said further: "Where the law is plain the subsequent re-enactment of a statute does not constitute adoption of its administrative construction." In Busey v. Deshler Hotel Co., 6 Cir., 130 F.2d 187, 190, 191, 142 A.L.R. 563 [not cited in the briefs], we applied this principle and discussed pertinent authorities, among others Helvering v. Wilshire Oil Co., 308 U.S. 90, 100, 60 S.Ct. 18, 24, 84 L. Ed. 101, wherein the Supreme Court said: "The oft-repeated statement that administrative construction receives legislative approval by reenactment of a statutory provision without material change (United States v. Dakota-Montana Oil Co., [288 U. S. 459, 466, 53 S.Ct. 120, 77 L.Ed. 893]) * * * does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers." Helvering v. Reynolds, 313 U.S. 428, 432, 61 S.Ct. 971, 85 L.Ed. 1438, 134 A.L.R. 1155, and Helvering v. Credit Alliance Corporation, 316 U.S. 107, 113, 62 S.Ct. 989, 86 L.Ed. 1307, were among the authorities which we cited. Compare Higgins v. Commissioner, 312 U. S. 212, 61 S.Ct. 475, 85 L.Ed. 783. In Hackett v. Commissioner of Internal Revenue, 159 F.2d 121, 124, the Court of Appeals for the First Circuit made the sensible statement that practicality engenders doubt "as to the breadth of Congressional familiarity with, and endorsement of, the myriad rulings and interpretations of the Commissioner."

The case of the Warren Automobile Club of claimed exemption from taxation is even weaker than that of the Chattanooga Automobile Club, in that practically the sole revenue of Chattanooga was from dues, while Warren, in the taxable year, made a net profit of $4,597.05 from selling licenses to non-members, plus $471.75 in notary fees. This was most substantial, for its net overall profit for the period was only $2,286.11. Without the profit from these transactions with outsiders, the club would have been required either to curtail its services, or to increase the dues charged its members.

In Jockey Club v. Helvering, 2 Cir., 76 F. 2d 597, 598, it was held that a jockey club which maintained an experimental horse-breeding station and bureau, but was organized chiefly for the protection and enjoyment of the sport of kings and common-

ers, was not a "scientific corporation" exempt from income tax. Discussing the exemption of clubs whose earnings do not inure to the benefit of members, the court pointed out that while on occasion a club may make a profit without losing its exemption it may not, without doing so, receive from transactions with outsiders more than reimbursement of their cost to the club. The opinion stated: "If it turns out upon computation that they [transactions with outsiders] are such a source over a substantial enough period to justify the conclusion that this is deliberate, we agree with the Board that the club is making earnings which 'inure to the benefit' of the members, though they are not distributed." In West Side Tennis Club v. Commissioner of Internal Revenue, 2 Cir., 111 F.2d 6, 8, the same court held that where a tennis club was incorporated to provide courts for use of its members but charged admission to national championship tennis matches played on its courts at Forest Hills, Long Island, New York, from which it derived net operating income of more than one-half of the gross income derived from club dues and the club's ordinary activities, it was not entitled to exemption from income tax as a "club operated exclusively for pleasure, recreation, and other nonprofitable purposes." Compare Better Business Bureau v. United States, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67.

It is true that, in Keystone Automobile Club v. Commissioner of Internal Revenue, supra, the scope of the outside activities of the club beyond service to its members was broader than in the Warren case. We think, however, that the controlling principles applied in that case are the same which we have applied here. Likewise, there is no dissimilarity between the applicable principles in the cases before us and those applied in Smyth v. California Automobile Ass'n, 9 Cir., 175 F.2d 752, in which the California association was held not to be a club exempted by the code section to which reference repeatedly has been made.

As previously indicated, though the revenue of the Chattanooga Automobile Club was derived almost exclusively from dues we have, for reasons heretofore appearing, found it, as well as the Warren Automobile Club, not to be a club exempt from taxation under section 101(9) of the Internal Revenue Code.

Accordingly, the decision of the tax court in each case is affirmed.