POLISH AMERICAN CLUB, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Polish American Club, Inc. v. Commissioner
Docket No. 423-71.
United States Tax Court
T.C. Memo 1974-207; 1974 Tax Ct. Memo LEXIS 113; 33 T.C.M. (CCH) 925; T.C.M. (RIA) 74207; August 6, 1974, Filed. Stanley J. Mosio, for petitioner. R. Burns Mossman, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined the following deficiencies in petitioner's Federal income tax: Year
Amount 1966
$ 778.43
1967
983.80
1968
2,052.41
Total
$3,814.64
The primary issue for decision is whether petitioner was exempt from income tax under the provisions of section 501(c) (7)[1] for the taxable years 1966, 1967 and 1968. In the alternative petitioner claims exemption under section 501(c) (4). Should we decide that petitioner does not qualify for exempt status under either section 501(c) (7) or section 501(c) (4), the following issues must be decided: (1) Whether the amounts received for dues and "special calls" from club members in 1966, 1967 and 1968 *116 constitute taxable income to petitioner under section 61(a); (2) Whether respondent properly determined petitioner's deductions for depreciation; and (3) Whether petitioner is entitled to deductions in 1966, 1967 and 1968 for charitable contributions for gifts of miscellaneous club property. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference. The petitioner, Polish American Club, Inc., is a corporation organized under the laws of Minnesota. Its principal office and club facilities are located at St. Paul, Minnesota. The Internal Revenue Service on July 27, 1945, granted the club an exemption from Federal income tax under the provisions of section 101(9), Internal Revenue Code of 1939 (predecessor of section 501(c) (7)). The club filed a Federal Return of Organizations Exempt From Income Tax (Form 990) for each of the taxable years 1966, 1967 and 1968. The club was organized in 1928 and incorporated in 1929. Its constitution sets forth its general purposes as follows: (1) To provide *117 for the comfort, education, recreation and general welfare of its members; (2) To secure for its members proper recognition and consideration in the matter of municipal improvements and governmental affairs; (3) To promote a proper regard for the principles of American citizenship; and (4) To foster the language, traditions and culture of Poland. The club's facilities consist of a clubhouse constructed in 1928 and located at 1003 Arcade Street, St. Paul, Minnesota. It is located in the Polish-American section of St. Paul and there were 8,000 to 10,000 people of Polish descent in the neighborhood of the club during the years in issue. The building owned by the club consists of two floors. The first floor contains a large meeting hall and two small rooms used by the club officers. The basement level contains two meeting halls, a kitchen, a large barroom and rest rooms. The club is open to members seven days a week. Its bar serves beer and soft drinks during the hours the club is open. During 1966 through 1968, the club membership was divided into three classes: active or regular members; social members; and honorary members. Regular membership was open to male persons *118 of Polish descent who had attained the age of 18 years whose application was approved by the membership committee and the club membership. Social membership was designed to permit persons not of Polish descent to join the club, and any male whose application was approved could become a social member. Social members had no vote in matters pertaining to the management of the club, no right to attend regular meetings of the club, no right to hold an elective office in the club and had only such privileges as the club by vote of its active members determined. Honorary membership was granted for distinguished service in areas of interest fostered by the club. During the years 1966, 1967 and 1968 the annual dues were as follows: Regular Member
$10.00
Social Member
10.00
Honorary Member
-0-
During the same years the initiation fee for a new regular member was $12.The club had a membership roll of approximately 120 regular members, 30 social members and 30 honorary members. As an auxiliary to the club, wives and daughters of men of Polish descent established the Polish American Club Ladies' Auxiliary, which in 1966, 1967 and 1968 had approximately 110 members. *119 Wives and daughters of men of Polish descent were regular members of the auxiliary. All other members of the auxiliary were classified as social members. The constitution of the auxiliary provides that its goals are: [Fraternal], patriotic, historical and education; to provide for the comfort, recreation and general welfare of its members and the people of Polish Decent [sic]; to maintain true allegiance to the Government of the United States of America, and fidelity to its laws; to foster true patriotism; to maintain and extend the institutions of American Freedom; to aid and assist, as an auxiliary, the Officers and Members of the Polish American Club. In 1966 the board of directors of the club recommended that the club facilities be remodeled because the building was rundown to the point where it was necessary to either remodel or go out of business. The improvements to the club facilities were financed by loans and mortgages from a St. Paul bank. During the period 1965 through 1968 the improvements to the building were as follows: Improvements
Date
Cost Men's Rooms
5/1/65
$701.73
Basement
8/1/67
12,361.95
Air Conditioning
9/1/67
771.00
General
10/1/68 19,036.46
TOTAL
$32,871.14
*120 During the period 1965 through 1968, the club acquired equipment and furniture as follows: equipment Date Cost Tables 5/ 1/65 $ 960.00
Carpeting 7/1/67 1,751.00
Ice Cuber 12/1/67 450.00
Adding Machine 12/1/67 78.18
Color Television 12/1/68 514.68
Chairs 12/1/68 355.00
TOTAL $4,108.86 In 1966, 1967 and 1968, the club purchased a 1-inch business card advertisement in the "yellow pages" of the St. Paul, Minnesota telephone directory. The listing was under the heading "Halls and Auditoriums" and indicated that the club's facilities were available for private parties, private dances, receptions and meetings. The listing also indicated there was a bar and kitchen, the capacity was 25 to 300 persons and a telephone number was given to call for reservations. The monthly expense for purchasing such space was $12 in 1966 and $12.75 in 1967 and 1968. In addition, the club purchased a listing under "Halls and Auditoriums" and under "Clubs" in the Minneapolis, Minnesota telephone directory "yellow pages" during 1966, 1967 and 1968. The cost for the Minneapolis listing was $3 per month. There was no statement in that listing as to any restrictions on the use or rental of club *121 facilities. At the bottom of the stationery used by the club during 1966, 1967 and 1968, there was printed "Hall For Rent For All Occasions." No restrictions as to use or rental of the club's facilities appeared on the stationery. The only restriction on rental to nonmember individuals or groups was the the club facilities be available. During each of the years 1966, 1967 and 1968, the club rented its facilities and furnished accommodations to individuals and organizations for weddings, stag parties, showers, other social parties, meetings of American Legion posts, labor unions and business organizations. The gross receipts from members and nonmembers of the club, not including proceeds from loans and contributions to capital, for the years 1966, 1967 and 1968 were as follows: $9 [2]
1966
1967
1968
Cash Register (Cash Bar Sales)
$ 3,996.40
$ 7,290.30
$5,478.50
Rentals' Accommodations and Commissions
7,251.11
9,151.79
13,076.30
Dues
1,168.00
1,529.00
1,414.00
Special Calls
251.96
236.75
169.60
Bar #3
736.20
600.00
653.74
Interest
99.80
47.70
124.61
Special Events and Miscellaneous 6,208.11
8,388.91
7,277.76
$ 19,711.58
$ 27,244.45
$ 28,194.51
*122 In 1966, 1967 and 1968, there were receipts from nonmembers and nonguests in the amounts of $5,253, $5,649.18 and $9,184.15, respectively. Such amounts represented approximately 27 percent, 21 percent and 33 percent, respectively, of the club's gross receipts for such years. A comparison of the use of the club facilities for scheduled nonmember functions and scheduled member functions is as follows: taxable Year
Nonmember
Member 1966
154
46
1967
117
63
1968
150
51
The club made payments of $5 from the general operating funds of the club to members who were reported sick. During the years 1966, 1967 and 1968, such payments were made to members in the total amounts of $50, $75 and $50, respectively. In 1966, 1967 and 1968, the *123 club made charitable contributions as follows: 1966 Date
Donee
Amount 1/29/66
Fund
$100.00
3/22/66
College of Our Lady of the Ozarks
10.00
5/23/66
St. Casimir's Church
25.00
6/24/66
American Legion
5.00
8/30/66
St. Casimir's Church
10.00
11/28/66
Our Lady of Fatima Shrine
$10.00
$ 160.00 1967 1/28/67
St. Casimir's
$ 50.00
4/10/67
St. Casimir's
55.00
10/17/67
Oil Chemical and Atomic workers 10.00
$115.00 1968 1/18/68
March of Dimes
$ 2.00
1/27/68
Phalen Youth Club
25.00
1/27/68
Lockwood Playground 25.00
$52.00
On September 23, 1969, the Internal Revenue Service revoked petitioner's exemption from tax under section 501(c) (7) of the Internal Revenue Code of 1954, for the taxable year beginning January 1, 1966, and subsequent taxable years. The Commissioner, in his statutory notice of deficiency, determined that for the taxable year ended December 31, 1966, and subsequent taxable years, petitioner was not exempt from taxation under the provisions of section 501(c) (7) of the Internal Revenue Code because the extent to which petitioner made its *124 facilities available to the general public constituted a business which was generally carried on for profit and represented a substantial activity. He further determined the taxable income for each of the taxable years 1966, 1967 and 1968 and resulting deficiencies in income tax. OPINION Petitioner was determined to be an exempt social club under section 101(9) of the Internal Revenue Code of 1939 and section 501(c) (7) of the Internal Revenue Code of 1954, until the Internal Revenue Service revoked the exemption for the taxable year 1966 and subsequent taxable years. To be so exempt petitioner must prove itself to come within the definition of section 501(c) (7) which is as follows: Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder. (7)-1 (7)-1 Section 1.501(c) (7)-1, Income Tax Regs., elaborates upon the social club definition as follows: (a) The exemption provided by section 501(a) for organizations *125 described in section 501(c) (7) applies only to clubs which are organized and operated exclusively for pleasure, recreation, and other non-profitable purposes, but does not apply to any club if any part of its net earnings inures to the benefit of any private shareholder. In general, this exemption extends to social and recreation clubs which are supported solely by membership fees, dues, and assessments. However, a club otherwise entitled to exemption will not be disqualified because it raises revenue from members through the use of club facilities or in connection with club activities. (b) A club which engages in business, such as making its social and recreational facilities available to the general public or by selling real estate, timber, or other products, is not organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, and is not exempt under section 501(a). Solicitation by advertisement or otherwise for public patronage of its facilities is prima facie evidence that the club is engaging in business and is not being operated exclusively for pleasure, *126 recreation, or social purposes. However, an incidental sale of property will not deprive a club of its exemption. [Emphasis supplied.] The statutes and regulations require that exempt social clubs be organized and operated exclusively for pleasure, recreation and other nonprofitable purposes. The case law has modified this requirement by allowing social clubs to qualify for exemption under section 501(c) (7) when its outside profits were: (1) strictly incidental to club activities, not as a result of an outside business; and (2) either negligible or non-recurring. United States v. Fort Worth Club of Fort Worth, Tex., 345 F.2d 52, 57, modified and affirmed per curiam, 348 F.2d 891 (C.A. 5, 1965). However, when the outside income is both substantial and recurring the statutory requirements are not satisfied and the social club is not exempt from tax. Coastal Club, Inc., 43 T.C. 783 (1965), affirmed per curiam 368 F.2d 231 (C.A. 5, 1966), certiorari denied 386 U.S. 1032 (1967); West Side Tennis Club v. Commissioner, 111 F.2d 6 *127 (C.A. 2, 1940), certiorari denied 311 U.S. 674 (1940). In addition to the requirement that the club be operated exclusively for nonprofit purposes, no part of the net earnings may inure to the benefit of the members. The most obvious violation of this requirement would be a dividend distribution to members, but the net earnings may inure to members in ways other than by direct distributions. See Aviation Club of Utah v. Commissioner, 162 F.2d 984 (C.A. 10, 1947), affirming 7 T.C. 377 (1946). In comparing the ratio of outside income (nonmember income) to net earnings, we take into consideration the outside income in excess of the costs of producing such income, not merely the gross receipts of outside income. Jockey Club v. Helvering, 76 F.2d 597 (C.A. 2, 1935), affirming 30 B.T.A. 670 (1934). Petitioner attempted to demonstrate that the Commissioner abused his discretion in revoking petitioner's exemption whereby he attributed substantial portions of the club's revenues to nonmember functions instead of recognizing that a large number of those functions characterized as "nonmember" by the Commissioner were *128 either official club activities conducted under a name other than that of the club or were functions hosted by club members or the ladies' auxiliary. Petitioner further contends that a portion of the functions characterized by the Commissioner as nonmember functions were instances where the petitioner rented its facilities to nonprofit organizations of the community for a minimal "courtesy charge." Moreover, petitioner appears to contend that the source of club revenues, from member or nonmember, is not important to our consideration and that we should look instead to the use made of the revenues in determining whether the exemption should stand. Petitioner's authority for this proposition is Scofield v. Corpus Christi Golf & Country Club, 127 F.2d 452 (C.A. 5, 1942). On its facts, Corpus Christi Golf Club is distinguishable from the instant case. The courts in Fort Worth Club, supra at 57, and Coastal Club, Inc., supra, at 817 also found it distinguishable. It may, in fact, be fairly said that Corpus Christi Golf Club, supra, has been virtually distinguished into extinction. In Corpus Christi Golf Club, supra, *129 the organization operated a country club and golf course which derived substantial oil lease bonuses and royalties from club property. Because the court found that: (1) the club had nothing to do with the operation of the oil wells; (2) the money derived from the leases was "merely an incident to the ownership of the land"; and (3) the club did not derive income "from the public generally," the taxpayer's exemption was upheld. The closing paragraph of the court's opinion is quoted by petitioner in support of its argument: The statute expressly gives the exemption to clubs operated as this one was and as long as the exemption holds, all revenues, of the club without regard to their source, are exempt from tax, because under the statute it is the nature and character of the operations of the club and the use made of the revenues, and not their source, which determines the exemptions. * * * [Corpus Christi Golf Club, supra at 454.] In addition to the case being distinguishable on the facts, the portion of the opinion quoted above is misleading and petitioner's interpretation of the quote is likewise misleading. The court in Corpus Christi Golf Club, supra, *130 found that the taxpayer had not engaged in the types of activities which were inconsistent with its nonprofit, recreational activities because the oil and leases were merely incidental to its ownership of land, even though the revenues derived from the leases were substantial. It follows from the court's determination that the taxpayer had not departed from its original nonprofit purposes and operations and that all revenues "from any source" are exempt from tax and "the use made of the revenues, and not their source, * * * determines the exemptions." [3]
*131 The court's statement cannot be interpreted, as petitioner urges, to mean that income from whatever source or activity is permissible so long as the use of such income is in furtherance of the club's exempt purposes and operations. Under the statute and regulations, we must first determine whether petitioner operated during the years in question exclusively for pleasure, recreation and other nonprofit purposes. We think that there is little doubt from the record that petitioner did not so operate. During 1966, 1967 and 1968, petitioner openly advertised its facilities as available for rental to the general public in the yellow pages of local telephone directories. This is prima facie intent on the part of petitioner to engage in an outside business for profit. (7)-1 (7)-1 Sec. 1.501(c) (7)-1, Income Tax Regs. The statement of petitioner's president that the advertisements were purchased for "ego and pride" in order to inform visiting Polish-Americans of the existence of the club lacks plausibility. During 1966, 1967 and 1968, a comparison of member to nonmember functions at the club is as follows: Taxable Year
Nonmember
Member 1966
154
46
1967
117
63
1968
150
51
*132 Petitioner contends that many of the functions characterized by respondent as nonmember were in fact member functions. We have given petitioner credit for those functions which were official club functions sponsored by the club itself but we have not given petitioner credit for those functions which were hosted by club members because petitioner has failed to prove that at least 75 percent of those in attendance were members of the club. See Rev. Proc. 64-36, 1964-2 C.B. 962, now superseded by Rev. Proc. 71-17, 1971-1 C.B. 683. Petitioner contends that many of the nonmember functions represented rentals received from nonprofit organizations which were only charged a minimal "courtesy charge." The records of the club indicated unaccountable fluctuations in rental receipts but petitioner failed at trial to prove which organizations were, in fact, nonprofit and also failed to present any evidence which would allow us to judge whether the rental charges were at or below cost. Moreover, a substantial portion of the revenues derived from all nonmember functions was from beer and soft drink sales so that a "courtesy charge" for rental of the hall would not *133 be an accurate indicator of the income derived from so-called nonprofit organizations. Based upon the above facts we find that petitioner's nonmember, outside income was substantial and recurring for the years in question and conclude from its activities and the profits derived therefrom that petitioner was not operated exclusively for pleasure, recreation and other nonprofit purposes. Petitioner was not without notice that its activities could jeopardize its exempt status. There is little doubt that the income derived from the nonmember functions inured indirectly to the benefit of club members because part of such income was used in remodeling the clubhouse as well as furnishing funds to pay expenses of the club. In the alternative, petitioner contends that it should be exempt as a civic club under the provisions of section 501(c) (4). Section 501(c) (4) allows exemption from income tax for: Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited *134 to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes. (4)-1 (4)-1 Section 1.501(c) (4)-1, Income Tax Regs., provides: (a) Civic organizations-- (1) In general. A civic league or organization may be exempt as an organization described in section 501(c) (4) if - (i) It is not organized or operated for profit; and (ii) it is operated exclusively for the promotion of social welfare. (2) Promotion of social welfare - (i) In general. An organization is operated exclusively for the promotion of social welfare if it is primarily engaged in promoting in some way the common good and general welfare of the people of the comminity. An organization embraced within this section is one which is operated primarily for the purpose of bringing about civic betterments and social improvements. * * * [Emphasis supplied.] (ii) Political or social activities. The promotion of social welfare does not include direct or indirect participation *135 or intervention in political campaigns on behalf of or in opposition to any candidate for public office. Nor is an organization operated primarily for the promotion of social welfare if its primary activity is operating a social club for the benefit, pleasure, or recreation of its members, or is carrying on a business with the general public in a manner similar to organization which are operated for profit. * * * [Emphasis supplied.] It is clear from the record that Polish American Club was conceived and operated primarily as a social club and not as an organization operated primarily for bringing about civic betterments and social improvements. It is obvious that the members of the club are concerned with civic improvement and have promoted patriotic participation in the affairs of their community and nation. These are laudable activities but they are not the primary activities of the club. We, therefore, hold that petitioner would not qualify as an exempt civic club under section 501(c) (4). Having decided that petitioner does not qualify as an exempt organization under section 501(c) (4) or 501(c) (7), we turn to disputed items of the Commissioner's determination of taxable *136 income. Given the finding that petitioner is a taxable entity there can be no doubt that it is taxable on income received from all sources including dues, "special calls," assessments and membership fees, in the absence of a showing by petitioner that these amounts were contributions to capital. See Keystone Automobile Club v. Commissioner, 181 F.2d 402 (C.A. 3, 1950), and United States v. Fort Worth Club, supra. No evidence was offered to prove contributions to capital; therefore, the Commissioner's determination in this respect is sustained. Petitioner's clubhouse was constructed in 1928 at an unknown cost and has been in continuous use since that time. The parties have stipulated that various improvements were made to the building during the period from 1965 through 1968. Petitioner's president testified that various other improvements were made to the building in 1959 such as the addition of wooden siding, the conversion of an open front porch to two front offices and the application of stucco covering. Such improvements were financed by a loan from Northwestern State Bank in the amount of $2,047. The exact date of the improvements as well *137 as the specific amount of the total loan spent on each improvement was not presented nor was any evidence offered as to the useful life of such improvements. Such costs will not, therefore, be added to the basis for depreciation determined by the Commissioner. Petitioner disputed the cost and useful lives of assets subject to depreciation determined by the Commissioner in his statutory notice of deficiency, but petitioner offered no proof to overcome its presumptive correctness. The useful life of the club building determined by the Commissioner was 33 years and its useful life expired prior to the years before us, resulting in no depreciation deduction allowable. No evidence was offered by petitioner to overcome such determination. Petitioner offered evidence of fair market value. The basis for computing depreciation is cost. Secs. 167(g), 1101 and 1012. Petitioner did not prove the original cost of the building. The cost is reduced each year for depreciation allowed or allowable. Sec. 1.167(a)-10(a), Income Tax Regs.; Lyndol L. Young, 268 F.2d 245 *138 (C.A. 9, 1959), affirming a Memorandum Opinion of this Court.If the taxpayer is exempt from tax, the basis is reduced by the depreciation that would be allowable. Sec. 1016(a) (3), I.R.C. 1954; sec. 1.1016-4(a), Income Tax Regs.
The last issue involves the charitable deductions under section 170(a) to which petitioner claims it is entitled in the amount of $5,000 for the donation of various miscellaneous items of club property to local charities. These donations occurred during the time the club was remodeling its facilities. The club made it known to local organizations such as the Salvation Army and St. Vincent dePaul that items were being discarded in the remodeling which included stoves, chairs, dishes and kitchen utensils and they would be available to those organizations if they would pick them up. No records were kept or produced at trial indicating which items were donated, the dates they were donated, or the fair market value of the property donated. Because petitioner has not substantiated the charitable deduction as required under section 1.170-1(a) (3), Income Tax Regs., we must hold *139 that no deduction can be allowed for such contributions in any of the years before us. To reflect concessions of respondent, Decision will be entered under Rule 155. Footnotes
1. All references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted. ↩
2. The receipts from nonmembers and nonguests are those receipts from rentals and accommodations derived from events which were not "club functions." Petitioner's president described club functions as events sponsored by the club or its ladies' auxiliary held strictly for the benefit of its nonmembers The nonmember receipts consist of receipts from functions which were hosted by members of the club or auxiliary. ↩
3. The court in Scofield v. Corpus Christi Golf & Country Club, 127 F.2d 452 (C.A. 5, 1942), found that the income derived from the oil leases did not inure to the benefit of any private shareholder. The court did not elaborate upon this point but its conclusions was apparently based upon the fact that no dividends or direct financial benefits inured to the shareholders in the club. We think the more widely accepted view recognizes that net earnings may inure indirectly to shareholders as a result of lower dues or building improvements which the shareholders enjoy but do not have to pay for, as well as by direct means such as dividends. See Aviation Club of Utah v. Commissioner, 162 F.2d 984 (C.A. 10, 1947), affirming 7 T.C. 377↩ (1946).