### GENERAL CONTRACTORS' ASS'N OF MILWAUKEE v. UNITED STATES.

No. 10658.

United States Court of Appeals,
Seventh Circuit.

March 11, 1953.

634

Herman M. Knoeller, Milwaukee, Wis., Truman Q. McNulty, Milwaukee, Wis., of counsel, for appellant.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Harvey M. Spear, Sp. Assts. to Atty. Gen., Timothy T. Cronin, U. S. Atty., Milwaukee, Wis., Charles S. Lyon, Asst. Atty. Gen., Robert N. Anderson and Maurice P. Wolk, Sp. Assts. to Atty. Gen., for appellee.

Before MAJOR, Chief Judge, and DUFFY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is an appeal from a judgment of the District Court dismissing the plaintiff's claim for the refund of corporate income and declared value excess profits taxes for the years 1945 through 1948.

The plaintiff, General Contractors' Association of Milwaukee, claims exemption from taxation under Section 101(7) of the Internal Revenue Code, 26 U.S.C.A. § 101(7). This section of the Code provides exemption for "Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual". Treasury Regulation 111, Section 29.101(7)–1, interpreting this provision, states that:

"A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. * * * Thus its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. * * *"

■ This regulation in substantially its present form has been in effect since the enactment of the Revenue Act of 1918 and has the force and effect of law. Automotive Electric Association v. C. I. R., 6 Cir., 168 F.2d 366, 367; Underwriters' Laboratories v. C. I. R., 7 Cir., 135 F.2d 371, 374.

The plaintiff corporation, organized in 1915 under the laws of Wisconsin, is an association of general contractors. It is the Milwaukee Chapter of The Associated General Contractors of America, Inc., a national organization having headquarters in Washington, D. C., with approximately 112 local chapters throughout the country. The plaintiff's authorized capital stock consists of 30 shares with a par value of $100 each. During the taxable years in question the major portion of this stock was issued and outstanding, one share being owned by each of plaintiff's members.

During the years 1945 and 1946 the plaintiff's statement of "objects and purposes" in its articles of incorporation outlined, first, measures designed to promote the building construction industry and the general welfare of contractors engaged in that industry. Section 2 then stated:

"To conduct, maintain, operate and carry on a Bureau of Quantity Survey and in connection therewith supply engineering and estimating reports; to

figure quantities and estimates in respect of prospective buildings, structures or contracting work. * * * "

In 1932 the articles had been amended to provide that the surveys of the Bureau might be furnished to non-members upon such terms and conditions as the Board of Directors might determine.

In January 1947, the articles of incorporation were again amended. As then amended the articles state that the "primary and principal" objectives of the Association are those designed to promote the building construction industry and the general welfare of contractors. The operation of the Bureau of Quantity Survey is then stated to be "subject, subordinate and incidental to" the objectives first mentioned.

The plaintiff's income during the taxable years in question was derived largely from dues paid by its members. There is a minimum membership fee of $60 per year. Additional dues are computed according to a graduated scale based on the dollar volume of excavation, concrete and masonry work received by a member. This schedule of charges is reduced by one-half on projects which are non-competitive, that is, work let without competition and on a single bid. The income is used to meet current operating expenses and any excess may be placed in a reserve "to promote the corporate objects and purposes" of the Association. The by-laws, as amended in 1947, expressly prohibit any distribution of the assets or revenue to the members of the Association except upon dissolution. Prior to this amendment in 1947, the articles of incorporation, Section 8 of Article VII, provided that the Board of Directors of the corporation might distribute all or any part of the corporation's reserve funds or surplus in such manner as may be prescribed by the by-laws "to members who have contributed thereto." We may assume that with that article of incorporation the by-laws authorized distribution of surplus to the members. In 1945 the membership fees collected by the plaintiff totaled approximately $25,000, in 1946, $32,000, in 1947, $44,000, and in 1948, $63,000. Net income ranged from about $4,800 in 1945 to more than $24,000 in 1948.

The plaintiff's only paid employees were an executive secretary, a stenographer and from two to three surveyors employed to make the analyses undertaken by the Bureau of Quantity Survey. Neither its five directors, its four corporate officers, nor the members of its various committees received any compensation for their efforts on behalf of the Association.

Functioning through its executive secretary and its numerous committees, the plaintiff has instituted or participated in various activities tending to promote the building construction industry and the general welfare of contractors engaged in that industry. These have included the conduct of safety schools and contests and the publication of articles and bulletins on safety and accident prevention; cooperation with labor and management groups in the negotiation of collective bargaining agreements and the adjustment of labor disputes; promotion of apprenticeship programs and the recruitment of labor; preparation of a building code and sponsorship of approved construction methods; promotion of a suggested guide to bidding procedures; and adoption of a code of ethical conduct for general contractors. The District Court specifically found that in accordance with certain of its objectives the plaintiff has undertaken "to promote and improve the ethical standards, bidding procedures, safety records, labor relations, labor supply, and public relations of general contractors." In some respects these efforts have been directed towards conditions peculiar to the Milwaukee area while others represent participation in activities of a more general scope originating with the national association.

The national association is tax exempt as a business league under Section 101(7) of the Internal Revenue Code. The controversy over the plaintiff's status for tax purposes arises solely because of the operation of its Bureau of Quantity Survey

Most of the plaintiff's members have their own survey and estimating departments to assist in the preparation of bids

for prospective contracts. However, the plaintiff's Bureau of Quantity Survey, upon request by a member or in anticipation of such request, conducts an independent survey of the quantity of material necessary for the excavation, concrete and masonry work on the particular project concerned. This analysis is then available to the members as a check against the data compiled by their own survey and estimating departments. As stated in testimony before the District Court, the purpose of the Bureau of Quantity Survey is to provide "a sort of an insurance" against estimating errors. It furnishes the members a degree of "mental security," enabling them to "sleep a little bit better at night." This maintenance of quantity survey facilities and services by the plaintiff for the benefit of its members has no counterpart in the national association.

Quantity survey reports are furnished to members at no additional cost above the regular scale of membership fees where the projects concerned are of a competitive nature. As we have heretofore stated the plaintiff's scale of membership fees is reduced by one-half on projects which are non-competitive. The reason for this differential is that ordinarily non-competitive work does not involve as much risk of costly errors in estimates and consequently the plaintiff's quantity survey facilities on such jobs are of less benefit to its members. However, if a quantity survey of a non-competitive project is requested by a member, then he is charged the full membership fee for that project in accordance with the rate prescribed for competitive work. This additional charge is made to compensate the plaintiff for the use of its quantity survey facilities. While quantity survey reports may be made available to non-members at cost, the major portion of the surveys made during the taxable years here in question were on projects let to members.

The District Court found as a fact that, "Plaintiff's Quantity Survey Bureau is engaged in business of a kind ordinarily carried on for profit"; that "One of plaintiff's principal purposes, objectives and activities was to operate its Quantity Survey Bureau"; and that "Plaintiff's members received individual services and benefits by reason of the reports furnished them by the Quantity Survey Bureau. These services and benefits were substantial and constituted the inurement of plaintiff's net earnings to such members." The District Court then concluded as a matter of law that: "Plaintiff is not a business league or trade association within the meaning of Section 101(7) of the Internal Revenue Code."

We think there can be no doubt that in operating its Bureau of Quantity Survey, as the District Court found, the plaintiff was engaged in business of a kind ordinarily conducted for profit. We may assume, as the plaintiff contends, that a professional survey company would ordinarily estimate both the quantity and the cost of all material, labor and overhead necessary to complete a particular project. The plaintiff's Bureau of Quantity Survey does not estimate the cost of these items but only the quantity. The difference, however, is one of degree only. In so far as a survey relates to these basic items, a survey made by plaintiff's survey department would be identical in scope and purpose with one prepared by a private survey organization.

Neither do we think it can reasonably be denied that plaintiff's earnings inured to the benefit of its members. Quantity survey reports were furnished to individual members. It is a familiar principle that earnings may inure to members of an association in a manner other than through the distribution of dividends. Thus, where valuable services are rendered to individual members, as in this case, it may be said that part of the net earnings of a taxpayer do inure to the benefit of its members within the meaning of Sections 101(6) and 101(7) of the Act. Northwestern Municipal Association v. United States, 8 Cir., 99 F.2d 460, 463; Northwestern Jobbers' Credit Bureau v. C. I. R., 8 Cir., 37 F.2d 880, 883.

But, the plaintiff contends, the fact that some economic benefits are enjoyed by the members of such an association from

activities which are similar to a business ordinarily carried on for profit does not destroy the exemption granted by Section 101(7) of the Act, where such profits are only incidental or subordinate to the main or dominant purposes of the association, which were to improve the general welfare of the construction industry in which plaintiff's members were engaged.

■■ In determining which purpose or activity of such an association is primary and which is incidental, each case must stand on its own facts. Retailers Credit Association v. Commissioner of Internal Revenue, 9 Cir., 90 F.2d 47, 52. In the instant case the question of fact before the trial court was whether or not the operation of the Bureau of Quantity Survey, with its attendant benefits to plaintiff's members, was a principal objective and activity of the plaintiff or whether it constituted only a minor, incidental activity. As we pointed out above, the trial court expressly found that the operation of the Bureau of Quantity Survey was one of the plaintiff's principal purposes, objectives and activities, and that the individual service and benefits received by plaintiff's members by reason of the reports from the Bureau were substantial and constituted the inurement of plaintiff's net earnings to the members. We may not set aside these findings unless we can say they are clearly erroneous. This we cannot do.

In its original articles of incorporation, filed September 3, 1915, the first object and purpose of the corporation was said to be "to conduct, maintain, operate and carry on the business of a Bureau of Quantity Survey." In enumerating the powers of the corporation, the first power described by these original articles was the power "To establish and operate this Bureau in connection with, but separate and distinct from, the general records of the corporation * * * with a limited membership, restricted to stockholders duly elected therein under the rules and regulations to be prescribed therefor." The next section of this same article provided for making and enforcing by-laws, rules and regulations controlling the use and benefits of the "information gathered, collected and possessed by said Bureau, and excluding therefrom and prohibiting the right of inspection, knowledge or use and benefit thereof * * * by all other persons not members of said Bureau in good standing."

These original articles throughout stressed the fact that the use of the records, information and reports of the Bureau was only for plaintiff's members who had also acquired membership in the Bureau. In July of 1920 the plaintiff amended its articles of incorporation. In the articles as amended the maintenance of the Bureau was named as the second of the five described objects and purposes of the corporation. But the maintenance of the Bureau was still placed first in the enumeration of the powers and authority of the corporation. Other provisions concerning the Bureau were also prominent in these amended articles.

■ It is true that in 1947 the plaintiff amended its articles of incorporation to state that the maintenance of the Bureau of Quantity Survey was "subject, subordinate and incidental to" the association's other "primary and principal" objectives. However, the frequent references to, and provisions concerning, the Bureau in plaintiff's 1947 articles and by-laws compels grave doubts concerning these late amendments which purported to relegate the Bureau to a role "subject, subordinate and incidental to" plaintiff's other objectives and activities. Nor is there anything in the record to indicate that this amendment resulted in any actual change in plaintiff's purposes, policies or activities. We think the 1947 amendment must "be considered as a belated attempt by plaintiff to bring itself within the form for exemption" and at the same time retain "its original corporate power and purpose to operate in the same manner" as it did prior to the amendment. Universal Oil Products Co. v. Campbell, 7 Cir., 181 F.2d 451, 462.

The District Court likewise could have been impressed by the composition of the plaintiff's letterheads. Prominently displayed in red letters in the center of the page are the words, "Bureau of Quantity

Survey." No clue is given to any other of the plaintiff's multifarious activities. We think it is a proper inference that the quantity survey department was thus being advertised as a significant, not an incidental, part of those activities.

Plaintiff's annual reports to its members for the four years in question consisted of about ten pages each. In each of these reports there was a detailed report, filling two of the ten pages, concerning the work figured by the Bureau of Quantity Survey. No other activity was reported in such detail.

There was also abundant evidence that a substantial portion of the plaintiff's current expenses, approximately 40 per cent, were directly attributable to the quantity survey operations. Certainly this is an impressive indication of their relative importance.

■ We shall not undertake to detail all the evidence upon which the District Court might properly have relied in finding as it did. It is sufficient to say that the record, considered as a whole, reveals a sufficient evidentiary basis for the finding.

The plaintiff relies strongly on C. I. R. v. Chicago Graphic Arts Federation, 7 Cir., 128 F.2d 424, Crooks v. Kansas City Hay Dealers Association, 8 Cir., 37 F.2d 83, and Milwaukee Association of Commerce v. United States, D.C., 72 F.Supp. 310, as support for its contention that operation of the Bureau of Quantity Survey was merely incidental to its main purposes. In each of those cases it was found by the trial court that the activities which it was contended destroyed the taxpayer's right to exemption were merely incidental or subordinate to the main purposes which accorded with the requirements for exemption and, therefore, the association concerned was not held to be disqualified. However, this court in the Chicago Graphic Arts case, after summarizing the findings of the Board of Tax Appeals, said, 128 F.2d at page 427:

"These findings of fact the Board was free to make; they were warranted by the evidence and are binding upon us. * * * and since the Board's decision is not based on an erroneous rule of law, it must be affirmed."

In the instant case the District Court has found that the operation of the plaintiff's Bureau of Quantity Survey was one of the plaintiff's principal activities and this finding is warranted by the evidence. We are not at liberty, therefore, to disturb that determination.

It follows from the view which we have taken on this question that the plaintiff is not entitled to relief under Section 101(6) of the Internal Revenue Code, assuming that that question is properly before us on this appeal.

It is equally clear under the facts as discussed above that the plaintiff's claim for exemption does not meet the specifications for exemption set out in Section 302 of the Internal Revenue Act of 1950.

The judgment is

Affirmed.