Texas Mobile Home Association v. Commissioner.
Texas Mobile Home Asso. v. Commissioner
Docket No. 84685.
United States Tax Court
T.C. Memo 1962-95; 1962 Tax Ct. Memo LEXIS 211; 21 T.C.M. (CCH) 510; T.C.M. (RIA) 62095; April 25, 1962
Truxton Shaw, Esq., 1414 Mercantile Bank Bldg., Dallas, Tex., Wright Matthews, Esq., and Robert K. Sands, Esq., for the petitioner. G. W. Ledbetter, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax and additions to tax under section 6651(a) of the Internal Revenue Code of 1954 for the years and in the amounts as follows: Sec. 6651(a)
Fiscal year ended
Deficiency
Addition
October 31, 1955
$1,191.77
$297.94
October 31, 1956
2,290.73
572.68
October 31, 1957
1,051.35
262.84
The questions presented for decision are: (1) Whether petitioner was an organization exempt from taxation as a business league under section 501(c)(6) of the Internal Revenue Code *213 of 1954 in its fiscal years ended October 31, 1955, 1956, and 1957. (2) If petitioner is found not to be exempt in the taxable years in issue, whether petitioner is liable for additions to tax for failure to file income tax returns for its fiscal years ended October 31, 1955, 1956, and 1957. (3) In the event both questions one and two are decided against petitioner, whether the addition to tax for its fiscal year ended October 31, 1957, is due from petitioner since the deficiency in income tax for that fiscal year has been eliminated by a carryback of a portion of a net operating loss sustained for its fiscal year ended July 31, 1960. The parties are agreed that petitioner sustained a net operating loss for its fiscal year ended July 31, 1960, in the amount of $12,339 and that if petitioner is not exempt from taxation $3,504.49 of such loss should be carried back to petitioner's fiscal year ended October 31, 1957, thus eliminating the deficiency in income tax for that year. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized on July 1, 1955, under the laws of the State of Texas, with its principal office *214 in Dallas, Texas. The organization began operations about 1952, prior to its incorporation. Petitioner did not file income tax returns for its taxable period ended October 31, 1955, and its fiscal years ended October 31, 1956 and 1957. Petitioner has no capital stock and no stockholders. Its corporate charter provides insofar as here pertinent as follows: THAT WE, the subscribers hereto, each a resident and citizen of the County of Nueces and State of Texas, acting under the laws of the State of Texas, do hereby associate ourselves together for the purpose of forming a corporation without capital stock and which shall be formed exclusively for the purposes hereinafter set forth, no member, officer or director of the corporation ever being privileged or authorized to receive any profit, and no profit ever to be received by any of them; and to that end, we, the subscribers hereto, do hereby adopt and subscribe to this charter of the corporation: * * *
The purpose for which the corporation is formed is the support of the following undertakings as authorized by Subdivision 53, of Article 1302 of the Texas Revised Civil Statutes of 1925, to-wit: to promote the general welfare *215 of the respective members; to sponsor comprehensive public education programs; to support a legislative program designed to protect the general public and to mutually benefit all members; to sponsor a program of study and research designed to correct unfavorable conditions and encourage the constant improvement of all phases of the association's activities; and to protect the membership against unfair trade practices. The number of directors shall be determined from time to time by by-laws of the corporation, never being less than three nor more than thirty-five. * * *
There shall be no capital stock. No member, director, or officer of the corporation shall receive any profit. All of the assets of the corporation at all times shall be devoted exclusively to the benevolent, charitable and educational purpose defined in Article Two hereof, and in the event of the dissolution of the corporation, shall then be delivered to that benevolent, charitable or educational corporation, organized not for profit and without capital stock, which the directors of this corporation at the time of such dissolution shall determine to be most appropriately organized and best able to carry out *216 further the purpose of this corporation as defined in Article Two hereof. Thus all operations of this corporation and all its assets at all times shall be and hereby are dedicated exclusively to and shall be devoted exclusively to the purposes defined herein. There are no assets or property owned by the corporation at this time. The by-laws of petitioner set out the qualifications for membership in Article III thereof, as follows: Section 1. KINDS - There shall be four kinds of membership, namely Regular, Associate, Honorary and Members-at-Large. Section 2. REGULAR MEMBERSHIP - Any reputable and recognized person or firm deriving all or any portion of their income from any phase of the mobile home industry shall be eligible for Regular Membership, subject to approval of the Membership Committee. Section 3. ASSOCIATE MEMBERSHIP - Any resident of a mobile home or employee of a business holding regular membership in this Association shall be eligible for Associate Membership. Section 4. HONORARY MEMBERSHIP - Any person or firm rendering unusual or praiseworthy service to the mobile home industry or making an outstanding contribution to the success or general welfare of the Texas *217 Mobile Home Association may be elected to Honorary Membership by a majority vote of the general membership. Section 5. MEMBERS-AT-LARGE shall be those whose business location is not within the area of an established Chapter. Petitioner's by-laws provided for chapters consisting of 5 or more members, chapter officers and association officers, an association board of directors and the method of their selection, and their duties. The by-laws also provide for annual and other meetings of the association with delegates from the various chapters, quarterly and special meetings of the board of directors, method of amending the by-laws, and that annual dues for members and associate members should be in amounts to be set at the annual meetings. During 1955 petitioner had 7 to 10 chapters and during 1956 and 1957 it had 12 and 15 chapters, respectively. Its membership consisted of owners and operators of mobile home parks, mobile home dealers, mobile home manufacturers, mobile home equipment manufacturers, mobile home equipment sales organizations, mobile home service organizations such as suppliers of manufactured gas, companies engaged in insurance, finance and repair of mobile homes, *218 firms engaged in towing and parking mobile homes, and real estate dealers in mobile home parks. There was a yearly increase from 1955 through 1957 in the number of petitioner's regular and its associate members. The purposes for which petitioner corporation was formed as set out in its by-laws were the same as set forth in its charter. Consonant with its stated purposes petitioner conducted business meetings, engaged in the promotion of State legislation favorable to its members concerning the maximum length of mobile homes and towing vehicles permitted on Texas highways, participated in certain civic undertakings together with the Red Cross and Civil Defense authorities, engaged in statewide screenings of motion pictures designed to show the attractions of mobile homes, and engaged in the dissemination of information of interest to its members and to others who expressed interest in planning mobile home parks, some without charge and some at a nominal charge as compared to its cost. In addition as one of its principal activities, petitioner conducted annual mobile home shows during the years 1955, 1956, and 1957 at the time and in conjunction with its annual convention. The *219 purposes of the annual shows were to encourage the sale of mobile homes and accessories thereto, to promote interest in mobile homes among the people of Texas, to assist manufacturers and suppliers in presenting their products to prospective customers in a central location, and to provide funds to employ an executive director and an office secretary to engage in the work of the organization. Petitioner rented the buildings in which the annual shows were held and in turn rented space therein to various exhibitors. The exhibitors included manufacturers of mobile homes, suppliers of accessories and services, finance companies, and insurance agencies. A majority of the exhibitors at each of the annual shows in the years here in issue were not members of petitioner. The same rental rate was charged to members as to nonmembers. The gross receipts from the annual shows in addition to rentals of space to exhibitors, included sales of tickets to the annual banquets, sales of advertising space in the show programs, and admission fees charged the general public. The first 2 days of these shows were reserved for dealers and during the remaining 2 days the shows were open to the public. During *220 the annual mobile home shows petitioner arranged for the conduct of certain trade classes on the proper servicing and installation of equipment which is used in mobile homes. Engineers from the various companies which manufacture refrigerators, stoves, butane and electrical equipment presented information of interest to those involved in the mobile home industry. The show programs also contained the convention programs. The convention programs included park operators' clinics, dealers' sales training programs, and reports on matters of interest to the mobile home industry such as State legislation, local property laws and expansion of Government-operated parks, as well as provisions for business meetings of the delegates. In 1957 petitioner's members received free individual advertising on the program published for the show. In this year petitioner's board of directors authorized the printing of 20,000 copies of the program allowing uniform advertisements for each member to be included therein without cost to the member with the inclusion of as much additional paid advertising as possible. The annual shows resulted in net profits of $844.30 for petitioner's fiscal year ended October 31, 1955, $11,618.44 *221 for its fiscal year ended October 31, 1956, and $3,230.66 for its fiscal year ended October 31, 1957. These net profits were transferred to petitioner's general operating fund and were used by it in payment of its normal operating expenses. Petitioner had no paid employees or officers prior to the beginning of preparations for the 1955 mobile home show which was held at Corpus Christi, Texas. In preparation for this show petitioner employed a man who was engaged in publicity work for a paper, the Florida Mobile Home News. This employee was compensated on a commission basis and the amount paid to him deducted in arriving at the $844.30 profit of the show. At about the beginning of its fiscal year ended October 31, 1956, petitioner employed an executive director, Rex Cox, on a parttime basis at $100 per month. At the meeting of petitioner's board of directors on May 7, 1956, a motion was passed to employ Rex Cox as petitioner's executive director on a full-time basis. Cox's salary was set at $500 per month. One of petitioner's officers agreed to furnish Cox a desk and office space in Dallas, Texas, which had been selected as the place for the 1956 mobile home show, during the tenure *222 of the show at no cost to petitioner. Subsequently petitioner rented a furnished office. It had previously purchased a typewriter, file cabinet, and ditto machine. Cox, as petitioner's executive director, spent a substantial amount of his time during the summer of 1956 after his employment on a full-time basis, working on arrangements for the mobile home show. In computing the $11.618.44 profit from the 1956 show, no part of the salary paid to Cox had been deducted. Late in the year 1956 petitioner employed a secretary for Cox at a salary of approximately $250 a month. In arriving at the profit from the 1956 show the amount $341of was deducted as clerical expense. On September 15, 1956, petitioner's board of directors at a regular meeting fixed Cox's salary as petitioner's executive director at $10,000 per year. During petitioner's fiscal year 1957 Cox continued to employ a secretary to assist with petitioner's clerical work in accordance with authorization from petitioner's board of directors. Both Cox and his secretary devoted time during petitioner's fiscal year 1957 to the general work of management of petitioner's operations and in arranging for and operating the 1957 mobile *223 home show. The receipts from the mobile home show in 1955 consisted of $8,122 from rents and $2.47 from miscellaneous receipts. The receipts from the mobile home show in 1956 consisted of the following: Rental space to members and non-
members
$26,534.79
Sale of banquet tickets
2,200.00
Admission fees
1,910.50
Show program (adv.)
1,580.00
The total receipts from the 1957 mobile home show were $44,982.03 and the amount charged as show expense was $41,751.37. The total disbursements of petitioner in its fiscal year 1957 other than those charged as expenses of the mobile home show were the following: Rent
$ 409.79
Telephone
451.13
Audit
25.00
Franchise Tax
25.00
Membership signs
252.50
Legal
25.00
Equipment
935.00
Dues
49.10
Insurance
252.75
Director expense
1,925.41
Office
1,225.57
Petitioner depended upon a profit from its mobile home shows to pay the salary of its executive director and its general office expenses. At petitioner's annual meetings and at meetings of its boards of directors during the years here involved, consideration was given to raising membership dues in order not to be dependent upon a profit from *224 the mobile home show to defray expenses. In a letter dated May 19, 1958, to an attorney, petitioner's secretary and treasurer stated: In reference to the Annual Mobile Home Show held in Dallas, sponsored by this Association the subject has been discussed at various Board of Director meetings. The majority opinion of the Board members is to the effect that [as] our services become more established and membership increases, we will be able to increase membership dues so that there will no longer be the need for the Association to operate the Annual Mobile Home Show as the membership dues will furnish enough income for the Association to continue operations and services on the needed scale. Receipts, disbursements and net incomes of petitioner for its fiscal years 1955, 1956, and 1957 are as follows: Fiscal Year
Fiscal Year
Fiscal Year
Ended Octo-
Ended Octo-
Ended Octo-
Receipts
ber, 31, 1955
ber 31, 1956
ber 31, 1957
From Past Years
$2,996.58
0
0
Due from Members
1,413.25
$ 3,025.32
$4,837.89 *
Net Receipts from Annual Show
844.30
11,618.44
3,230.66
Other Sources
250.00
23.88
77.19 *
$5,504.13
$14,667.64
$8,145.74
Disbursements
For Legislative Purposes
0
0
0
For General Operations
$ 966.32
$ 7,031.87
$4,641.25
For Convention Expense
565.22 **
0
0
Other Deductions
0
0
0
Total
$1,531.54
$ 7,031.87
$4,641.25
Net Income
$3,972.59
$ 7,635.77
$3,504.49
*225 Petitioner had two bank accounts. One bank was designated as the "Legislature Fund." No funds were disbursed from this account during the 3 fiscal years here involved. By letter of its secretary and treasurer dated October 1, 1956, petitioner transmitted to the district director of internal revenue at Dallas, Texas, an application for exemption from taxation under the provisions of section 501(c)(6) of the Internal Revenue Code of 1954. Prior to submitting the application for exemption petitioner's secretary and treasurer telephoned a lawyer and asked him for an exemption application. Petitioner's then secretary and treasurer is an accountant and the exemption application was made out in his office. He received no advice from others *226 as to the necessity of petitioner's filing income tax returns. In a letter dated February 25, 1958, the Chief, Exempt Organizations Branch, Internal Revenue Service, informed petitioner of the ruling of the Exempt Organizations Branch that petitioner was not entitled to exemption from taxation under section 501(c)(6) of the Internal Revenue Code of 1954, and that it was required to file income tax returns on Forms 1120. Petitioner sustained a net operating loss of $12,339 for its fiscal year ended July 31, 1960, [1] $3,504.49 of which may be carried back to its fiscal year 1957. Respondent in explanation of his determination of deficiencies and additions to tax against petitioner stated: It is determined that for the taxable year July 15, 1955, to October 31, 1955, and for the taxable years ended October 31, 1956, and October 31, 1957, you are not an exempt organization under the provisions of the internal revenue laws and that you are subject to income tax and to the additions to the tax for failure to file income *227 tax returns for these years. Opinion The principal question for decision here is whether petitioner during its fiscal years 1955, 1956, and 1957 was an organization exempt from taxation as a business league. Section 501(c)(6) of the Internal Revenue Code of 1954 provides for the exemption from taxation of "Business leagues, chambers of commerce, real-estate boards, and boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." To bring itself within the provisions of this statute petitioner must show that it meets the definition of one of the type of organizations listed, that it was not organized for profit, and that no part of its earnings inures to the benefit of a private shareholder or individual. While the term "business league" is not defined by the statute, section 1.501(c)(6)-1, Income Tax Regulations, [2] provides a definition which has been uniformly approved by the courts. American Automobile Association, 19 T.C. 1146 (1953) *228 and Apartment Operations Ass'n. v. Commissioner, 136 F. 2d 435 (C.A. 9, 1943) and cases therein cited, affirming 46 B.T.A. 229. *229 Petitioner's activities for the years here in issue, aside from the Mobile Home Show, in no way parallel those of a regular business ordinarily conducted for profit. It was not organized to earn a profit. The crucial questions here are, therefore, whether petitioner's activities have been directed toward the improvement of business conditions in its industry as distinguished from the performance of particular services for individual persons and whether petitioner's net earnings inured to the benefit of private shareholders or individuals. Respondent contends that petitioner, in conducting its annual Mobile Home Show, was engaged in furnishing a forum for individual advertising for its members. Respondent points out that at the show were many individual booths with placards that advertised the individual vendors of mobile homes and their component parts, that service companies, insurance agencies, and finance companies presented displays and booths to the general public, and that longterm sales promotion was the underlying reason for each exhibitor's participation in the show. He further contends that individual services were rendered to petitioner's members when each was given *230 free individual advertising. Petitioner contends that any individual services rendered to its members flowed from the fact that it served one industry as distinguished from business in general and were incidental to its primary purpose of improving business conditions in the mobile home industry relying upon such cases as Washington State Apples, Inc., 46 B.T.A. 64 (1942), Associated Industries of Cleveland, 7 T.C. 1449 (1946), and National Leather & Shoe Finders Association, 9 T.C. 121 (1947). The majority of the activities which respondent contends constitutes services rendered by petitioner to individual members, were in fact more in the nature of services offered to nonmembers who constituted the majority of the exhibitors at the home show and who paid a fee for the privilege of exhibiting. The placards and other information contained in these exhibits were those the exhibitors chose to display. The member service and finance companies which took booths at the mobile home show paid therefor at the same rate as the nonmembers and were in the minority. The free advertising given to members in the program for the 1957 show was an incidental *231 service to petitioner's members. Cf. Leather & Shoe Finders Association, supra.However, the facts in the instant case differ in an important particular from those in the cases relied upon by petitioner in which it was held that services rendered to individual members were incidental to the primary purpose of the organization. In those cases the income which supplied these services as well as the services of the common interest came primarily from dues or assessments paid by the members. In the instant case we do not consider it necessary to pass upon the question whether all the services rendered to individual members were incidental to petitioner's primary purpose since in our view petitioner has not shown that none of its net earnings inured to the benefit of its members. Earnings may inure to the benefit of members of an association in a manner other than through the distribution of dividends. Where an organization renders services to its members from which no profit is derived but which are made possible by the earnings of a profit making activity, it cannot be said that *232 none of the net earnings inures to the benefit of members. Fort Worth Grain and Cotton Exchange, 27 B.T.A. 983, 985 (1933) and cases there cited. Cf. General Contractors' Ass'n. v. United States, 202 F. 2d 633 (C.A. 7, 1953). The facts here show clearly that a primary purpose of the mobile home show was to raise the funds necessary to have a paid executive director for petitioner. The facts also show that such a paid executive director was beneficial in enlarging the activities of petitioner and increasing its services to members. Cf. Durham Merchant's Ass'n. v. United States, 34 F. Supp. 71 (M.D.N.C. 1940). The income from the mobile home show was derived primarily from nonmembers who paid fees to exhibit and for advertising in the show program, and to some extent from admissions paid by the general public. In each year the profit from the mobile home show was substantial in relationship to petitioner's other income. [3]
*233 Here the deriving of a profit from the mobile home show from charges made to nonmembers was deliberate and was intended to and did defray expenses for petitioner's other activities which except for this profit could not have been carried on without an increase in dues or other payments by members. Under these circumstances some of petitioner's net earnings inured to the benefit of its members. Jockey Club v. Helvering, 76 F. 2d 597 (C.A. 2, 1935), affirming 30 B.T.A. 670; West Side Tennis Club, 39 B.T.A. 149 (1939), affd. 111 F. 2d 6 (C.A. 2, 1940), certiorari denied 311 U.S. 674. In the instant case the profit derived from the show was not incidental to the other purposes of the show but the other purposes of the show were incidental to the purpose of making a profit with which to defray general expenses of petitioner. Cf. Trinidad v. Sagrada Orden, 263 U.S. 578 (1924). Petitioner is not exempt from taxation as a business league under section 501(c)(6) of the Internal Revenue Code of 1954. *234 Section 6651(a) of the Internal Revenue Code of 1954 provides for an addition to the tax for failure to file a return on the prescribed date unless it is shown that such failure is due to reasonable cause and not due to wilful neglect. No returns were filed for the taxable years here in issue. Petitioner states that it failed to file its tax returns because its application for exemption was under consideration by the Internal Revenue Service. The showing here is merely that petitioner's officers did not believe that petitioner was required to file returns since they thought it was exempt from tax and it had an application for exemption pending. A mere mistaken belief that no tax return was required under the statute does not consitute reasonable cause for noncompliance. West Side Tennis Club, supra.Here petitioner has made no showing of reliance on advice of competent counsel. Cf. C. R. Lindback Foundation, 4 T.C. 652 (1945), affd. per curiam, 150 F. 2d 986 (C.A. 3, 1945). The only evidence with respect to a consultation *235 with counsel is that petitioner's secretary and treasurer called and asked an attorney to procure a form of exemption application for him. Petitioner's secretary and treasurer was an accountant but there is no showing in the record that he was qualified in the field of income taxation or that he so considered himself. The record fails to show that petitioner's failure to file returns was due to reasonable cause within the meaning of section 6651(a) of the Internal Revenue Code of 1954. Automotive Electric Ass'n., 8 T.C. 894 (1947), affd., 168 F. 2d 366 (C.A. 6, 1948). Petitioner contends that since there is no income tax due from it for its fiscal year 1957 by reason of a net operating loss carryback, there can be no addition to the tax under section 6651(a) of the Internal Revenue Code of 1954 for its fiscal year 1957. Petitioner's contention is without merit. In C.V.L. Corporation, 17 T.C. 812 (1951) we held that the fortuitous circumstance of a net operating loss carryback eliminating the tax for *236 an earlier year did not excuse the delinquency in the filing of the return or eliminate the addition to tax for failure to timely file a return. Cf. Manning v. Seely Tube & Box Co., 338 U.S. 561 (1950), and John R. Rictor, 26 T.C. 913 (1956). Decision will be entered under Rule 50. Footnotes
*. These figures are contained in the notice of deficiency which the parties stipulated correctly reflected petitioner's income. From the evidence herein they cannot be reconciled precisely with the amounts shown in petitioner's audit report for its fiscal year 1957, a stipulated exhibit. ↩
**. This amount consists of two items as follows: ↩
Convention expenses, 1954
$524.17
Convention expenses, 1955
41.05
1. Petitioner had apparently changed its fiscal year from one ending October 31, to one ending July 31 sometime during or prior to 1960.↩
2. Sec. 1.501(c)(6)-1, Income Tax Regs. Business leagues, chambers of commerce, real estate boards, and boards of trade. A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of comerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. An association engaged in furnishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest, even though all of its income is devoted to the purpose stated. A stock or commodity exchange is not a business league, a chamber of commerce, or a board of trade within the meaning of section 501(c)(6)↩ and is not exempt from tax. Organizations otherwise exempt from tax under this section are taxable upon their unrelated business taxable income. See part II (section 511 and following), subchapter F, chapter 1 of the Code, and the regulations thereunder.
3. In petitioner's fiscal year 1956 the net profit from the mobile home show was over 75 percent of petitioner's total receipts. In the period ended October 31, 1955, the net profit from the show was only $844.30 but the gross receipts were $8,124.47 and it appears that some of the items of expense charged to the show in arriving at the net profit may have been paid from other funds of petitioner had the show not been held. For example, the 1955 convention expense must have been charged primarily to the show since the 1954 convention expense charged to petitioner's general funds was $524.17 as compared to $41.05 for 1955. In petitioner's fiscal year 1957 the net profit from the show was $3,230.66 as compared with other receipts of $4,915.08. In this year the receipts from the mobile home show were $44,982.03 and it is clear that expenses which were properly chargeable to petitioner's general operations were charged to the show. The record shows that a $10,000 salary was paid in this year to petitioner's executive director and that a salary was also paid to his secretary. Both of these items must have been charged against the receipts from the show since they do not otherwise appear in petitioner's disbursements. The record is clear that the executive director and his secretary spent much of their time on the general work of petitioner and that their full salaries were not proper expenses of the mobile home show. One of petitioner's witnesses estimated that 35 percent of the executive director's time was spent on the home show. If only 35 percent of the executive director's salary and that of his secretary had been attributed to the show, about 75 percent of petitioner's receipts in its fiscal year 1957 would have been net income from the show.↩