MAYNARD HOSPITAL, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4685–65, 3141–64, 3295–64, 3306–64, 3313–64, 378–65, 4814–65, 4684–65, 4686–65—4690–65. Filed September 25, 1969.

---

[1] Cases of the following petitioners are consolidated herewith: James E. Hunter and Nadine N. Hunter, docket No. 3141–64; Estate of Gordon G. Thompson, Joel N. McFee, Executor, docket No. 3295–64; Glenn N. Rotton and Gail Rotton, docket No. 3306–64; Winnifred M. Glasgow, docket No. 3313–64; William A. Glasgow Trust, the Bank of California, N.A. Trustee, docket No. 378–65; R. D. Forbes and Mary L. Forbes, docket No. 4814–65; Glenn N. Rotton, Transferee, docket No. 4684–65; Winnifred M. Glasgow, Transferee, docket No. 4686–65; R. D. Forbes, Transferee, docket No. 4687–65; Estate of Gordon G. Thompson, Transferee, Joel N. McFee, Executor, docket No. 4688–65; William A. Glasgow Trust, the Bank of California, N.A. Trustee, Transferee, docket No. 4689–65; and James E. Hunter, Transferee, docket No. 4690–65.

*R. B. Hooper*, *H. B. Jones*, and *William C. Rutherford*, for the petitioners.

*Richard H. M. Hickok* and *Gary C. Randall*, for the respondent.

1020

OPINION

The principal question to be decided is whether Maynard was a tax-exempt organization. This determination will affect not only the issue of the deficiencies determined against the corporation and the liabilities of the stockholders as transferees of such deficiencies but also the issue of whether the amounts received by the stockholders upon liquidation of Maynard were ordinary income or capital gain. If Maynard was a nonexempt taxable corporation owned by its stockholders, the question of the taxability of the distributions to the stockholders might be treated differently than it would be if Maynard was a charitable corporation in which the stockholders had no equitable interest but held the stock merely for management purposes. See *Estate of Grace M. Scharf*, 38 T.C. 15 (1962), affd. 316 F. 2d 265 (C.A. 7, 1963).

Maynard was ruled tax-exempt by the Commissioner over its entire existence, 1933 through 1960.[4] First, in 1934 and from time to time thereafter, the Commissioner ruled, after reviewing Maynard's status, that it was entitled to tax exemption as a charitable organization. One of such rulings was made in 1943 after a conflict had arisen between the Commissioner and the Social Security Board regarding Maynard's status as a tax-exempt organization. The Social Security Board had ruled, after a public hearing in a matter involving the applicability of the Social Security Act to Maynard's employees, that Maynard was not a tax-exempt organization and that its employees were subject to the provisions of the Social Security Act. The matter was referred to the U.S. Attorney General who, on November 2, 1943, wrote a letter to the President of the United States supporting the Commissioner. The letter stated that in the opinion of the Attorney General the Commissioner's ruling granting Maynard's exemption was in accordance with

---

[4] Maynard's tax-exemption was originally granted under the predecessor to sec. 501(c) (3), I.R.C. 1954, and continued under that section which provides exemption for:

(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office.

the consistent policy of the Bureau of Internal Revenue of exempting hospitals not operated for profit, and with the intent of Congress.

The exemption was revoked by the Commissioner retroactively to 1940, nearly 5 years after Maynard had been completely liquidated and its assets distributed to its shareholders. The revocation was contained in the notice of deficiencies herein, dated June 7, 1965.

The law is clear that the Commissioner may reverse his earlier rulings and revoke Maynard's tax exemption retroactively, if the exemption was granted or continued as the result of an error of law. See *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180 (1957), and *Sonora Community Hospital*, 46 T.C. 519 (1966), affirmed per curiam 397 F. 2d 814 (C.A. 9, 1968). See also *Lorain Avenue Clinic*, 31 T.C. 141 (1958), in which we upheld respondent's retroactive revocation of the exemption of the taxpayer organization even though the revocation was made after the taxpayer's dissolution and was for all years of its existence. However, the long lapse of time between the earlier rulings granting Maynard's exemption and the revocation ruling, the fact that Maynard had ceased to exist and its assets had all been distributed 5 years prior to the notice of revocation and the further fact that from early 1940, when the pharmacy was separated from the hospital, there had been no substantial changes in the operations of the hospital are matters to be considered in determining whether respondent abused his discretion in revoking the ruling retroactively.[5]

Maynard was organized as a not-for-profit corporation under the laws of the State of Washington by a group of Seattle doctors who owned and controlled it throughout its existence. Its patients were charged the prevailing fees and rates. It was self-supporting from the first year of operation, and consistently showed moderate profits. Those profits were permitted to accumulate and, for the most part, were invested in U.S. bonds and other securities. Eventually, on Maynard's dissolution, they were distributed to the stockholders pro rata along with Maynard's other assets.

Maynard began operations on borrowed funds. It never received more than a nominal amount of charitable contributions for general use. Its charitable services accounted for only a small portion of its total services to the public. According to its books and records, the actual costs of its charities were less than 1 percent of its total expenses. However, this does not cover all of what might be regarded as the hospital's charitable services. Patents who were found to be unable to pay their bills often had them reduced or entirely canceled. Patients

---

[5] Sec. 7805(b), I.R.C., provides:

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

were never refused admission because of their inability to pay. In short, except for its dealings with the pharmacy, First Hill Co., which we will discuss further, Maynard seems in its daily operations to have followed the same practices as many other hospitals; that is, charging patients who were able to pay at the usual rates, reducing, or not pressing, collections from needy patients, and not turning away patients because they were unable to pay.

Respondent in his notice of deficiency did not state his reason for revoking Maynard's exemption. In his argument he lists such items as salaries paid to some of the stockholders, free services to the doctor stockholders and their families, the small amount of charitable services rendered, and the siphoning off of hospital profits to the pharmacy as changes in its operation of which he had had no previous knowledge. The record indicates that his change of position as to Maynard's tax-exempt status may to some extent have been prompted by the final distribution of Maynard's accumulated "tax free" earnings to stockholders. In *Mill Lane Club, Inc.*, 23 T.C. 433 (1954), we held that a tax-exempt social luncheon club did not lose its exemption for the year it dissolved and sold its assets and distributed the proceeds left after payment of debts to its members. We said that the liquidating sale of the assets was not a profit-making transaction but was a singular event in the club's history and pointed out that the fact that the charter of a social club provided for the distribution of its assets to its members upon dissolution did not destroy the exempt status of the social club. We held that the distributions to members of a social club under the circumstances present in the *Mill Lane Club* case could not properly be classified as "net earnings."

Respondent argues that the stockholders from the beginning, or at least from 1940 obtained or kept Maynard's exemption by making false representations to the Bureau of Internal Revenue, or by withholding vital information concerning Maynard's organization and operations. He points out that he was never informed of changes in Maynard's charter or bylaws or operations and that he did not know of certain payments to stockholders and free services rendered to them by Maynard. Respondent stresses the restrictive buy-and-sell agreements between the stockholders and the purchase and sale of Maynard's shares by them, the "diversion" of the pharmacy income from Maynard to the trustees, and, finally, the distribution of tax-free accumulated earnings to the stockholders as the primary justification of his retroactive revocation of Maynard's tax exemption. The principal "diversion" of income to the trustees, as charged by respondent, was the spin-off of the pharmacy and pharmacy income to them.

Respondent contends that the pharmacy's earnings were at all times the income of the hospital.

We agree with respondent that the "spin-off" of the pharmacy from the hospital was for the benefit of the trustee-stockholders rather than the hospital. After the pharmacy was transferred to First Hill Co., a separate corporate entity, it was no longer owned by the hospital as a matter of form. However, it used the tradename "Maynard Hospital Pharmacy" throughout its existence. It was strictly a money-making enterprise. It kept making purchases of drugs in the name of the hospital at the usual hospital discount, kept its alcohol tax exemption and narcotics license in the hospital's name, and obtained all its income from the hospital or hospital patients. Part of that income was from selling drugs and supplies referred to as free floor stocks to the hospital at a price of 10 percent over the price the hospital would have been required to pay had it bought the drugs and supplies directly. The 10-percent markup on free floor stocks was a direct diversion through the pharmacy of funds of the hospital for the benefit of the doctor-stockholders. The balance of the drug sales did not constitute quite as direct diversion of hospital profits to the pharmacy but the result was in substance the same. The sales made to patients of prescription drugs were all sales to hospital patients. Such sales had been made by the hospital pharmacy prior to the time the pharmacy was transferred to the stockholder-trustees. The floor-stock drugs for which the patients were charged were billed by the pharmacy at retail plus 10 percent to account for any loss that might result from spilling or other reasons. Apparently there was a 25- to 35-percent discount from the retail price given to the hospital for the sales to patients of prescription drugs, thereby to some extent splitting the profit from the sale of these drugs to patients between the hospital and the pharmacy. It is not clear whether this discount applied to floor-stock drugs, and if so, whether the 10-percent increase to account for loss was applied before or after the discount. However, these drugs were bought by the pharmacy at wholesale in the name of the hospital and at the hospital discount. Except for the organization of the pharmacy as a separate entity, the entire profit on the sale of prescription and floor-stock drugs to patients would have gone to the hospital.

The evidence is clear that the primary reason for the organization of the pharmacy as a separate entity was to permit the stockholder-trustees to obtain some income from the hospital operation. The stockholder-trustees attempted to justify the receipt of this income by claiming that it was less than they should have received as compensation for their services to the hospital. However, it is questionable

whether such services entitled them to compensation in the amounts they received in distributions from the pharmacy. The evidence shows that Forbes, apparently from about 1950 until Maynard's dissolution in 1960, rendered no services to Maynard except as a trustee but continued to receive his distribution from the pharmacy income. The evidence further shows that from 1956 through 1960 Glasgow's estate received its distributable portion of the pharmacy income although it rendered no services to the hospital or pharmacy and apparently from Wyckoff's death in 1948 until the sale of his Maynard stock to Rotton in August 1949, Wyckoff's estate received its prorata distribution of income. Also, the pharmacy interest, both under the agreements between Maynard's stockholders and in practice, went to any person to whom Maynard stock was transferred without reference to services contributed by each person to Maynard. The distribution of the pharmacy's income was in substance much like the payment of a dividend on the Maynard stock.

The Commissioner apparently had no specific notice of the change in operations when the pharmacy was separated from the hospital. He did have indirect notice when the pharmacy filed separate income tax returns, first as a corporation and later a partnership, and by the notations of payments made by the hospital to the pharmacy on the Forms 990 filed by the hospital for the years 1941 through 1943. The failure of Maynard to furnish respondent with changes in its bylaws and to specifically answer certain questions on the Forms 990 and 990A which it filed, and particularly its failure to indicate specifically on those forms its transfer of the pharmacy to its stockholder-trustees to be operated for their profit, may have caused respondent to overlook the changes in Maynard's operations. The fact that the pharmacy used Maynard's alcohol-tax exemption and that the pharmacy continued to purchase drugs in Maynard's name might even have been affirmatively misleading to respondent. Under the facts of this case, we conclude that respondent did not abuse his discretion in retroactively revoking his ruling granting Maynard an exemption. Petitioners do not specifically so contend; they argue that respondent's action was "unfair and unreasonable," in that petitioners were handicapped in obtaining evidence because of the passage of time. In *Lorain Avenue Clinic, supra*, a similar contention was regarded as an appeal for equitable consideration and not as support for the proposition that respondent had abused his discretion in retroactively revoking an exemption. See also *Kenner* v. *Commissioner*, 318 F. 2d 632 (C.A. 7, 1963), affirming a Memorandum Opinion of this Court.

The only statutory authorization for granting tax exemption to hospitals is the general provisions of section 501(c)(3). Like any other charitable organization, hospitals must be organized and operated exclusively for charitable purposes as distinguished from private

1030

gain. An organization is not exempt merely because it operates a hospital devoted to the treatment and care of patients.[6]

The cases involving the tax exemption of hospitals have been decided on the facts in each particular case. The exemption has been denied where the hospitals were operated to a considerable extent for the benefit of the founders or owners. See *Sonora Community Hospital, supra,* where the clinic was operated, to a considerable extent, for the benefit of its two founding doctors, and *Lorain Avenue Clinic, supra,* where the clinic was operated by a close family group designated "trustees" and substantially all of its profits were distributed regularly to them and associated doctors. In both those cases there was a minimum of charitable services. To the same effect is *Kenner* v. *Commissioner, supra,* where substantially all of the funds of the hospital were expended for the benefit of its founder and owner.

There is no dispute that the stockholders at all times regarded their interests in Maynard as a valuable property right. They gave those interests a fixed price in buy-and-sell agreements and in several in-

[6] Respondent's Rev. Rul. 56–185, 1956–1 C.B. 202, states in this regard:

The only ground upon which a hospital may be held to be exempt under section 501(c)(3) of the Code is that it is organized and operated primarily for educational, scientific or public charitable purposes. Usually, the ground for exemption is that it is organized and operated for public charitable purposes. The Supreme Court of the United States in *Helvering* v. *Susan D. Bliss et al.,* 293 U.S. 144 Ct. D. 884, C. B. XIII–2, 191 (1934), held that the provisions of law granting exemption of income devoted to charity are liberalizations of the law in the taxpayer's favor, were begotten from motives of public policy, and are not to be narrowly construed. Thus, in regard to hospitals and similar organizations, the Internal Revenue Service takes the position that the term "charitable" in its legal sense, and as it is used in section 501(c)(3) of the Code contemplates an implied public trust constituted for some public benefit, the income or beneficial interest of which may not inure to the benefit of any private shareholder or individual.

In order for a hospital to establish that it is exempt as a public charitable organization within the contemplation of section 501(c)(3), it must, among other things, show that it meets the following general requirements:

1. It must be organized as a nonprofit charitable organization for the purpose of operating a hospital for the care of the. sick. A nonprofit hospital chartered only in general terms as a charitable corporation can meet the test as being organized exclusively for charitable purposes. See *Commissioner* v. *Battle Creek, Inc.,* 126 Fed (2d) 405.

2. It must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay. It is normal for hospitals to charge those able to pay for services rendered in order to meet the operating expenses of the institution, without denying medical care or treatment to others unable to pay. The fact that its charity record is relatively low is not conclusive that a hospital is not operated for charitable purposes to the full extent of its financial ability. It may furnish services at reduced rates which are below cost, and thereby render charity in that manner. It may also set aside earnings which it uses for improvements and additions to hospital facilities. It must not, however, refuse to accept patients in need of hospital care who cannot pay for such services. Furthermore, if it operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered.

\*   \*   \*   \*   \*   \*   \*

4. Its net earnings must not inure directly or indirectly to the benefit of any private shareholder or individual. This includes the use by or benefit to its members of its earnings by way of a distribution of profits, the payment of excessive rents or excessive salaries, or the use of its facilities to serve their private interests. If provision is made in the bylaws for dividends, exemption will not be allowed even though no dividends have been declared. Exemption will not be defeated, however, merely because the shareholders or members might possibly at some future date share in the assets upon dissolution in the absence of a case of mal fides where there appears to be a plan on the part of the shareholder or individual to acquire assets on the dissolution of the corporation.

stances actually bought and sold them. The prices ascribed to the shares by the stockholders themselves increased as did the corporation's net worth. In 1935 Moore sold his interest to Forbes for $5,500. In 1940 a price of $12,500 for a one-fifth interest was fixed and in 1948 Wyckoff's interest was purchased by Rotton at that price. While these transfers were made not solely for income realization but also for the purpose of perpetuating the organization and maintaining its services and standing as a community hospital, the evidence indicates that the stockholder-trustees expected that eventually they or their estates would realize income from the sale or transfer of their interests in Maynard or the final distribution of its assets to them.

There is evidence that there was some intention on the part of the stockholders to use the accumulated profit for improvement and expansion of the hospital. The trustees had architectural plans for such improvements prepared sometime before they decided to sell the hospital. The estimated costs were more than $1 million. Maynard's accumulated surplus was never more than about one-half of that amount and its free assets which could have been used for hospital improvements far less. However, there was never any commitment that this would be done. One of the reasons why the trustees decided to sell was their reluctance at their advanced ages to assume the new financial responsibilities which they would incur in modernizing the hospital.

Much of the argument in this case concerns whether there was "bad faith" on the part of the stockholder-trustees in the various actions they took to assure some monetary return from their investment of their time and energy on behalf of Maynard. In our view it is not necessary that the record show "bad faith" on the part of the stockholder-trustees to justify respondent's revocation of Maynard's exemption. All that is necessary is that it show that some of the Maynard operations were not "exclusively" for charitable purposes or that some of its "net earnings" inured to the benefit of its stockholders. This the record does show. While the payment of reasonable salaries for services rendered by the doctor-stockholders would not necessarily be considered net earnings inuring to their benefit, the situation here presents a different picture.

It is doubtful, too, whether an organization's operation can be "exclusively" for charitable purposes, within the meaning of section 501(c)(3) when its income is being accumulated to increase directly the value of the interests of the stockholders which they expect, eventually, to receive beneficially. The payment of hospital funds to the stockholders through their pharmacy partnership was in substance a direct "inuring" of "net earnings" of the hospital to the benefit of such stockholders. That the payments may not have been made with fraudulent intent or even in "bad faith" is not determinative.

Maynard's transfer of the pharmacy business to the corporation

set up and owned by the stockholder-trustees and the sale by that corporation, and later the partnership which succeeded to the corporation's business, of drugs to Maynard for prices in excess of the amounts Maynard would have paid directly for such drugs was the siphoning off of Maynard's income for the benefit of its stockholder-trustees. When this fact is considered together with the many other facts here present, such as the buy-and-sell stock agreement and the small amount of charitable work done by Maynard, we conclude that Maynard was not operated "exclusively" for charitable purposes during the years 1940 through 1960 and therefore is not entitled to exemption from tax under section 501(c)(3) and its predecessor section, I.R.C. 1939, for those years.

We need not pass on the legality under the law of the State of Washington of the distribution of Maynard's assets to the shareholders to determine whether Maynard is exempt from Federal income tax. There is presently pending before the courts of the State of Washington an action brought by the State to recoup the distributed assets.[7] However, whether Maynard is a nonprofit charitable organization under the laws of the State of Washington and whether its net assets upon its dissolution were impressed with a public trust is not determinative of whether it is exempt from Federal income tax under section 503(a). *Sonora Community Hospital, supra,* and *Lorain Avenue Clinic, supra.*

Having concluded that Maynard was a taxable corporation for the years 1940 through 1960 we must further determine whether respondent correctly included in its taxable income the income of the pharmacy and whether assessment of deficiencies for the years 1954 through 1960 is barred by the statute of limitations.

After its separation from the hospital, no tax exemption was claimed for the pharmacy. Its income was separately reported and taxed, first as corporate earnings, and later as income to the partners. None of the stockholders rendered any substantial service to the pharmacy operation and only one rendered any services on a regular basis.

As we have pointed out in discussing the distribution of the pharmacy income to the stockholder-trustees, there was no "business purpose" for operating the pharmacy as a separate entity from the hospital except to siphon off some of the income from the total operation for the benefit of the stockholder-trustees. The $50-per-month rental was

---

[7] The original complaint in this action was filed on July 21, 1967. After the filing of an amended complaint, an answer thereto, and a stipulation of facts, the Superior Court of the State of Washington for King County held that Maynard was a charitable organization under the laws of the State of Washington and the receipts from the disposition of its assets upon dissolution should be turned over to another public charity but that the pharmacy was a for-profit business organization under the laws of the State of Washington. The King County Court determined that less than one-half the portion of the sales price which the stockholders allocated to the pharmacy was in fact in payment for the assets of the pharmacy. The decision of the King County Court has been appealed by all parties to the Supreme Court of the State of Washington.

apparently nominal. Except possibly for 1 year it was not separately shown on Maynard's Forms 990 or Forms 990-A, although a place was provided thereon for listing rents. The alcohol exemption regularly used by the pharmacy was in the name of the hospital. The only purpose served by the so-called separate entity of the pharmacy was to permit the equivalent of dividends to be paid to the stockholder-trustees by Maynard. The pharmacy income was in substance Maynard's income and is taxable to Maynard.

As to the statute of limitations, the evidence is that Maynard filed information returns Forms 990 and 990-A for the year 1941 and all later years which contained complete profit-and-loss statements and balance sheets. The Commissioner contends that some of the returns bore false statements and did not contain all of the information for which they were designed. He complains that the returns did not inform him of the changes in Maynard's bylaws relating to the pharmacy and the payments to the stockholders. However, some of the information which the returns failed to disclose was available to the Commissioner from other sources. For instance, the pharmacy filed its own income tax returns. We have stated in fair detail in our findings some of the various statements and omissions to which respondent refers.

Section 6501(a) provides that except as otherwise provided, any income tax must be assessed within 3 years from the date of the filing of the returns. Section 6501(c)(3)[8] provides that where no return is filed, the tax may be assessed at any time. Section 6501(g)[9] which is applicable only to 1954 and subsequent years, there being no counterpart of the provisions of this section in the 1939 Code, provides that if a taxpayer "determines in good faith that it is an exempt organization and files a return as such under section 6033 * * * such return shall be deemed the return of the organization for purposes of this section."

On the basis of the evidence in this case we conclude that Maynard did determine in "good faith" for each of the years 1954 through 1960 that it was an "exempt organization" and that the Forms 990-A it filed for the years 1954 through 1960 were sufficiently accurate to constitute

[8] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.
  (c) EXCEPTION.—
    *    *    *    *    *    *    *
    (3) NO RETURN.—In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.
[9] SEC. 6501(g) CERTAIN INCOME TAX RETURNS OF CORPORATIONS.
  (1) TRUSTS OR PARTNERSHIPS.—If a taxpayer determines in good faith that it is a trust or partnership and files a return as such under subtitle A, and if such taxpayer is thereafter held to be a corporation for the taxable year for which the return is filed, such return shall be deemed the return of the corporation for purposes of this section.
  (2) EXEMPT ORGANIZATIONS.—If a taxpayer determines in good faith that it is an exempt organization and files a return as such under section 6033, and if such taxpayer is thereafter held to be a taxable organization for the taxable year for which the return is filed, such return shall be deemed the return of the organization for purposes of this section.

the "returns * * * under section 6033" referred to in section 6501. See *Knollwood Memorial Gardens*, 46 T.C. 764, 793–794 (1966). We, therefore, hold that assessment of tax against Maynard is barred by the statute of limitations for the years 1954 through 1960 since the notice of deficiency was mailed more than 3 years after the filing by Maynard of its returns for each of these years. However, the assessment of the liability for tax of Maynard for the taxable year 1960 against the transferees is not barred since under the provisions of section 6901(c) (1) respondent is allowed 1 year after the expiration of the period of limitations for assessment against the transferor, Maynard, to assess the liability against the transferees of Maynard. Maynard filed its return for the calendar year 1960 on May 15, 1961, and therefore the statute of limitations for assessment against Maynard expired on May 15, 1964. Respondent mailed his notice of transferee liability to each of the transferees of Maynard on May 7, 1965, which was within 1 year after the expiration of the period of limitations for assessment against Maynard.

Petitioners do not contend that the assessment of any tax against Maynard is barred by the statute of limitations for the years 1940 through 1953. Since we have concluded that Maynard is not exempt from tax and that the earnings of First Hill are properly includable in Maynard's income, it is necessary to decide whether Maynard's stockholders are liable for Maynard's taxes for the years 1940 through 1953 as transferees, and if so, the extent of their liability.

Petitioners contend that the $159,018.42 which was allocated to First Hill from the amount received from the sale of the Maynard assets should not be considered as a part of the Maynard assets transferred to the Maynard stockholders in determining transferee liability. From our discussion of the relationship of Maynard and First Hill, it is apparent that we consider the entire amount received in 1960 from the sale of the Maynard assets to belong to Maynard. The clear inference from the record is that the allocation of part of the receipts from the sale of the Maynard assets to First Hill was made to enable the stockholders to retain as great a portion of the distribution as possible if they were required to turn the amount received from the Maynard assets over to some other charity or to the State of Washington. Whatever may be the final outcome of the State Court contest with respect to the distribution in 1960 of the Maynard assets to the stockholders, we conclude that for Federal income tax purposes all the distribution to the stockholders in the net amount of approximately $618,728 was from assets of Maynard. Each stockholder is therefore liable as a transferee of Maynard for taxes due by Maynard for the years 1940 through 1953 and for the year 1960 to the extent of his prorata proportion of the amount of the distribution unless, as petitioners contend, the holding of the Superior Court of the State of Washington for

King County that the assets of Maynard were impressed with a trust for use of a public charity causes the individual petitioners not to be transferees.[10]

Respondent contends that on dissolution of Maynard its assets were distributed in kind to its stockholders and that the stockholders then sold the land and buildings, together with hospital supplies and pharmacy inventories having a value of not less than $550,000, to Stewards at a ficticious, or unrealistic, price of $305,000. Respondent therefore contends that the total value of the assets transferred by Maynard to its stockholders was $937,851.59 and that each stockholder is chargeable with his prorata portion of such amount, both for the determination of his transferee liability and his taxable gain from the distribution.

Our view is that in substance there was a liquidating sale by Maynard of its fixed assets to Stewards and a distribution of the proceeds of the sale, along with other cash and bonds, to the stockholders. The purported distribution of the assets in kind to the stockholders was a matter of mere form. Maynard's transfer of its assets to Hunter as liquidating trustee, Hunter's transfer of beneficial interests therein to the stockholders, the individual stockholders' transfer of their interest in Maynard back to Hunter as their trustee, and Hunter's transfer of the assets to Stewards, were all part of the same liquidating plan and all took place simultaneously. A binding agreement for the sale of the hospital properties, setting forth all of the terms and conditions of the sale, had been entered into by the stockholders and Stewards before any of the transfers ever took place. In the field of taxation substance must prevail over form, *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945), and the rule works for the benefit of the taxpayer as well as the Government. *Frank Ciaio*, 47 T.C. 447, 457 (1967). See also *Alameda Realty Corporation*, 42 T.C. 273 (1964).

Petitioners state that under the holding of the Superior Court of the State of Washington in and for the County of King, they are liable to pay into the court substantially all the amounts received from the liquidation of Maynard to be disposed of by further order of the court in accordance with the impressing of the funds with a trust for a public charitable purpose. For this reason they contend that

---

[10] Of course, if the tax liability of Maynard for the years 1940 through 1953 with interest thereon as provided by law was less than the value of the assets transferred to a particular transferee, the limiting factor on the liability of each transferee would be the tax liability of Maynard. It appears from the record that the tax liability of Maynard for the years 1940 through 1953 with interest to Sept. 22, 1960, and the tax liability of Maynard for the year 1960, as determined by respondent is $392,697.65. This amount is much greater than the value as determined by respondent of the assets transferred to any one transferee. Respondent is entitled to a determination of the full liability against each transferee and therefore it is necessary for us to find the exact value of the assets transferred to each transferee even though respondent is not entitled to collect from all transferees an amount in excess of Maynard's total liability plus interest as provided by law.

they cannot be considered to the transferees of Maynard for Federal income tax purposes.

We have very much abbreviated the voluminous documents comprising the pleadings, stipulations, findings of fact, conclusions of law, and judgments in the case in the Superior Court of King County, Wash., in our Findings of Fact. However, these documents are stipulated into the record by the parties by a second supplemental stipulation of facts, and are incorporated in full in our findings by our finding of the facts as stipulated. It is clear from the whole proceedings that the judgment of the Superior Court was directed at the net assets of Maynard in the hands of the various petitioners. It is also clear that to the extent that Maynard was liable for Federal income taxes, there existed a prior claim on its assets, thereby reducing the amount of its assets properly distributable to anyone, whether it be petitioners or the State, to be turned over to some appropriate charity. Therefore, in our view the petitioners are transferees of the assets of Maynard to the extent of $618,798.73 and each stockholder is liable as a transferee of Maynard to the extent of his prorata proportion of the amount of the distribution.

There is no dispute between the parties as to the proportion of the distribution from Maynard applicable to each stockholder. There is nothing inconsistent in a corporation being dedicated to a charitable purpose under State laws and therefore being obligated to have all its earnings, or accumulation of earnings, and its assets, or increment in value of its assets when sold, being dedicated to the public use and impressed with a trust for a public charity, and the same corporation being subject to Federal income tax because its stockholders actually managed and operated it in such a manner as to have a substantial portion of the corporate earnings inure to their own benefit. As is apparent from this record, the State court action was not commenced until 2 years after the deficiency notice determining deficiencies against Maynard was mailed by respondent and almost 2 years after the filing of the petitions in the case of Maynard and the various transferees of Maynard.

The State court case has not been finally determined but is on appeal. Perhaps the disposition of the funds ordered to be paid into the State court by Maynard's stockholders can be resolved between the parties. In any event in our view the obligation for taxes to the Federal Government existed at the time of the dissolution of Maynard. Since the stockholder-petitioners actually took all of the funds of Maynard upon its dissolution, they became transferees of the assets of Maynard for Federal income tax purposes.

The final issue is whether the stockholders' portions of the distribution over their costs of Maynard's stock are taxable to them as ordinary income or as capital gain. Respondent apparently does not question the amount of costs and expenses which petitioners reported as applicable to their combined interests in Maynard and First Hill Co.

Respondent contends that Maynard was a charitable corporation under the laws of the State of Washington and that its stock was held by its stockholders for management purposes only. Respondent further contends that even though section 331(a) provides that "amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock" such section does not operate to cause a distribution in liquidation of a charitable corporation to be a capital gain. Respondent relies on *Estate of Grace M. Scharf, supra*, in which we stated at page 28 as follows:

There is nothing in the record to establish that the membership certificates in Belmont were property. The clear import of the bylaws is that the certificates, insofar as they evidence membership in Belmont, granted a privilege to and imposed a responsibility upon the holders to serve a charitable institution.[4] [Footnote omitted.]

Initially, certainly the stock issued to petitioners in the instant case was intended to be for the purpose of their management of Maynard and the initial intent was that Maynard would be operated as a charitable organization exempt from Federal income tax under the predecessor of section 501(c)(3). However, at least by 1940 when the stockholder-trustees of Maynard in form separated out the pharmacy in order to be able to obtain for their own benefit funds from the operation of Maynard, they began to manage and operate Maynard partially for their own benefit. They always viewed their stock as a valuable asset having a money value to them. As early as 1936 there was a purchase of Maynard's stock. The facts in this case show that at least from 1940, and probably as early as 1936, the stockholder-trustees of Maynard treated their stock as an asset of value to them. They set a sales value on it and they used it to in form separate out a pharmacy business so that the overall operation of the hospital and pharmacy could produce income for their personal benefit. The treatment by Maynard's stockholders over a period of at least 20 years of their stock as an equity interest in the corporation was an important consideration in our determination that Maynard is not entitled to exemption from Federal income tax. On the basis of the record in this case, we conclude that the Maynard stock should be viewed as property in the hands of the stockholder-trustees for Federal income tax purposes. It follows that the distribution in complete liquidation of Maynard should, under section 331(a), be considered as in full payment for the

stock. Since each stockholder-petitioner had held his stock for more than 6 months, his gain on the distribution is long-term capital gain.

There is nothing in the *Scharf* case to indicate that the membership certificates there involved had ever been treated by the individual owners as giving them proprietary rights in the corporation. The membership certificates had been used for management purposes until they were sold. In our view when we have determined that an organization is not a tax-exempt charity but a taxable corporation operated for private gain over almost the entire period of its existence, it should follow that the gain to the stockholders upon the liquidation of that corporation should be taxable to them as capital gain and not as ordinary income. We do not consider *Estate of Grace M. Scharf, supra,* as applicable to the situation here present. We hold that petitioners properly reported the liquidating distribution as capital gain.

*Decisions will be entered under Rule 50.*