LOWRY HOSPITAL ASSOCIATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7264-73.    Filed August 12, 1976.

---

*Harold B. Stone* and *James E. McCollum,* for the petitioner.
*John B. Harper,* for the respondent.

WILBUR, *Judge:* Respondent has determined the following deficiencies in petitioner's Federal income tax:

| Taxable year | Deficiency | Taxable year | Deficiency |
|---|---|---|---|
| 1967 | $18,053.06 | 1970 | $20,846.86 |
| 1968 | 19,173.47 | 1971 | 13,947.87 |
| 1969 | 8,933.94 | | |

The issues presented for our decision are (1) whether petitioner qualified as a tax-exempt organization under section 501(c)(3)[1] during the years in issue and (2) whether petitioner's tax-exempt status may be retroactively revoked for taxable years ended prior to November 7, 1972.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a corporation organized under Tennessee law (ch. 67, sec. 1, et seq., Public Acts 1945, as amended, repealed 1968) as a "corporation for the general welfare of society and not for individual profit." Petitioner's principal business purpose is the operation of a hospital. When the petition was filed herein, its principal office was located in Sweetwater, Tenn. In each of the years in issue petitioner filed a Return of Organization Exempt from Income Tax with the Mid-Atlantic Service Center, Philadelphia, Pa.

Petitioner's hospital is and has been located in a three-story brick building in downtown Sweetwater, Tenn., and serves a community of about 40,000 people. During the years in issue the hospital had beds and facilities for approximately 30 patients. The Sweetwater area has one other hospital with a capacity for about 60 patients. During the years 1967 to 1972 there were between six and eight doctors in the area.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] Two additional issues, the deductibility of petitioner's payments to a nursing home and the deductibility of petitioner's payment for a building water sprinkler system, have not been addressed by petitioner on brief. We consider these issues abandoned by petitioner, and note that in any event, petitioner has not carried his burden of proof with respect to them. Rule 149(b), Tax Court Rules of Practice and Procedure.

Petitioner was incorporated as a nonprofit organization under Tennessee law in December 1954. The incorporators of petitioner were Dr. Telford A. Lowry (Dr. Lowry), Florence C. Lowry, his wife, Juanell Campbell, William E. Howe, and Elizabeth D. Lowe.[3] Dr. Lowry is a physician who has practiced in Sweetwater since 1946. William E. Howe, a practicing attorney in Sweetwater, has acted as attorney and director for petitioner and as trustee of a trust for Dr. Lowry's daughter. Juanell Campbell has been an employee of the hospital since 1953, and its administrator since 1958.[4]

From October 1, 1957, to January 1, 1968, petitioner leased the hospital building from Florence C. Lowry, individually, and Dr. Lowry as trustee of a trust for the benefit of their children. On January 1, 1968, the hospital property was conveyed to William E. Howe, trustee of a trust for the benefit of Dr. Lowry's daughter, and during the years 1968 through 1971, petitioner leased the hospital building from the trust. Pursuant to the lease, petitioner paid a monthly rental of $1,300 for the use of the

---

[3] During the years in issue, the following persons served as officers of the petitioner:

| | |
|---|---|
| Telford A. Lowry, M.D. | President (1967-71) |
| Troy Bagwell, M.D. | Vice president (1967-70) |
| William E. Howe | Vice president (1971) |
| Juanell Campbell | Secretary-treasurer (1967-69, 1971) |
| Dennis Brackett | Secretary-treasurer (1969-70) |

Petitioner's board of directors was composed as follows:

| 1967 | 1968 |
|---|---|
| Telford A. Lowry, M.D. | Telford A. Lowry, M.D. |
| Troy Bagwell, M.D. | Troy Bagwell, M.D. |
| Percy Swainson | William E. Howe |
| Juanell Campbell | Juanell Campbell |
| 1969 | 1970 |
| Telford A. Lowry, M.D. | Telford A. Lowry, M.D. |
| Troy Bagwell, M.D. | Troy Bagwell, M.D. |
| William E. Howe | William E. Howe |
| Dennis Brackett | Dennis Brackett |
| Juanell Campbell | Juanell Campbell |

1971
Telford A. Lowry, M.D.
Troy Bagwell, M.D.
William E. Howe
Dennis Brackett
Juanell Campbell

Dr. Troy Bagwell practiced medicine in Vonore, Tenn., following his retirement from surgical practice elsewhere. Percy Swainson is a druggist in Sweetwater. Dr. Bagwell did not attend any board meetings after Jan. 9, 1968.

[4] From August 1969 until December 1970, Dennis Brackett served as hospital administrator.

building and the adjoining parking lot. The petitioner also paid $200-per-month rent to Dr. Telford Lowry for the use of a paved parking lot located across the street from the hospital. In June 1972, petitioner purchased the hospital building for $300,000 cash, paid in two installments, $90,000 in July 1972 and $210,000 in December 1972. The $300,000 purchase price equaled the amount set forth in an appraisal by Norman B. Lee, a real estate broker in Madisonville, Tenn.[5]

During the years in issue, the Lowry-Henshaw Clinic (the clinic) was located in the same building as the hospital. Dr. Lowry and Dr. Joe Henshaw (Dr. Henshaw) considered themselves partners in the clinic, and shared profits and losses equally. The clinic paid $300 per month for the space in the building occupied by the clinic and for the use of the adjoining parking lot. These payments were made directly to the trustee pursuant to the lease agreement between petitioner and the trust that owned the building.

The hospital building contained 10,259 square feet of floor space. Of this amount, 8,244 square feet was used exclusively by the hospital; 985 square feet, exclusively by the clinic. The remaining 1,030 square feet was common space used by both the clinic and the hospital.

The common space contained the hospital's laboratory and X-ray room. It also contained a room used as an emergency room by the hospital and on a daily basis as a treatment room by the clinic and by doctors other than Drs. Lowry and Henshaw. Additionally, it contained two business offices, the reception room, restrooms, and the common entrance to the building.

The hospital and the clinic worked in close cooperation, often sharing supplies and services. For example, the charge for drugs purchased at the local drug store was made on a joint bill and the hospital and clinic portions were allocated by the hospital administrator. Where it was difficult to determine the specific charges allocable to the hospital or clinic, a reasonable allocation was made by the hospital administrator. Similarly, the hospital's pathological work was done by third parties who sent a single bill for the work performed. The hospital paid for the specific portion of the bill relating to pathological services performed for hospital patients; the clinic paid for the portion of the bills

---

[5] The building was appraised in 1963 and valued at $160,000.

specifically relating to outpatients. The clinic paid the telephone bills [6] for both the hospital and the clinic ($16,191.57 total for the years in issue) and the hospital paid the utility bills for both the hospital and the clinic ($18,126.59 total for the years in issue).

Hospital and clinic employees frequently did work for both operations. During the years in issue, the hospital had approximately 30 employees; the clinic, 3 employees. The following were employees who served both in varying degrees during this time:

| Employee | Salary paid by | Employee | Salary paid by |
|---|---|---|---|
| Administrator | Hospital | Insurance clerk | Hospital |
| Outpatient nurse | Clinic | Insurance clerk | Hospital |
| Outpatient nurse | Hospital | Receptionist-switchboard | |
| Lab technician | Hospital | operator | Clinic |
| Lab technician | Clinic | Janitorial personnel | Hospital |

The clinic's outpatient nurse worked for the hospital when it had an emergency or had need for an additional nurse. At other times, the hospital's outpatient nurse assisted the clinic's nurse. The lab technicians, one employed by the hospital and one by the clinic, worked together performing laboratory and X-ray services for both the hospital and the clinic. The two insurance clerks, both employed by the hospital, handled claims for both the hospital and clinic and also did the billing for both the hospital and clinic. Janitorial personnel employed by the hospital provided janitorial services for both the clinic and the hospital. The registration of patients of both the hospital and the clinic was handled by the receptionist employed by the clinic.

If an outpatient of Dr. Lowry or Dr. Henshaw subsequently needed hospitalization, fees for the doctor's services and that of the hospital would be included on the same bill sent to the patient. Stationery on which bills were sent contained the names of both petitioner and the clinic. When payments were received on the bill, they were applied to hospital charges first. The hospital made a reasonable attempt to collect its bills, but collection by an agency, attorney, or lawsuit was not attempted.

The clinic paid the hospital $300 per month for services rendered, covering the use of laboratory and X-ray equipment

---

[6] All of the telephones in the building occupied by petitioner and the clinic are connected to one central switchboard and were billed collectively by the telephone company.

owned by the hospital, janitorial services, and administrative services including the services of the insurance clerks and the hospital administrator.

Although petitioner had an open-staff hospital in which any licensed doctor could admit patients and use the hospital's facilities, approximately 92 percent were patients treated by Dr. Lowry and Dr. Henshaw, about 10 percent of these patients being referrals from other physicians. The clinic was Dr. Lowry's primary source of income. In addition, Drs. Lowry and Henshaw each received $5,000 per year from the hospital for being on call for any emergencies that might have arisen.

Florence C. Lowry, wife of Dr. Lowry, was employed by the petitioner as the hospital's dietitian, and she also supervised the purchasing, preparation, and serving of the food to the hospital patients. In compensation for these services, Mrs. Lowry received the following salary:

| Year | Salary | Year | Salary |
|------|--------|------|--------|
| 1967 | $300 per month | 1970 | $425 per month |
| 1968 | 325 per month | 1971 | 435 per month |
| 1969 | 425 per month | | |

The Sweetwater Valley Convalescent and Nursing Home, Inc. (nursing home), is a private corporation organized under Tennessee law. During the years in issue, 50 percent of its stock was owned by Dr. Lowry and 50 percent by a trust for the benefit of Dr. Lowry's children. During the years 1965 through 1968, petitioner made several loans to this nursing home at interest rates ranging from 4 to 5 percent. Each of the loans was evidenced by a separate, executed promissory note, but all the loans were unsecured. The following is a schedule of these loans:

| Date | Amount | Interest rate (percent) | Date paid |
|------|--------|------------------------|-----------|
| July 6, 1965 | $37,352.50 | 4 | 5/31/73 |
| Sept. 7, 1965 | 5,070.18 | 4 | 11/9/72 |
| Oct. 7, 1965 | 3,574.57 | 4 | 11/9/72 |
| Nov. 6, 1965 | 6,477.30 | 4 | 12/12/70 |
| Jan. 10, 1966 | 27,397.74 | 4 | 5/10/72 |
| Jan. 10, 1966 | 12,395.18 | 4 | 12/11/72 |
| Mar. 24, 1966 | 12,968.89 | 4 | 2/10/72 |
| July 14, 1966 | 11,146.34 | 4 | 12/9/71 |
| Jan. 11, 1968 | 15,856.94 | 5 | 4/10/70 |
| Feb. 1, 1968 | 31,548.34 | 5 | 7/7/71 |
| Mar. 11, 1968 | 17,981.43 | 5 | 2/15/71 |
| Apr. 12, 1968 | 7,181.97 | 5 | 10/12/70 |

| May 14, 1968 _____ | 4,129.07 | 5 | 10/12/70 |
| July 8, 1968 _____ | 3,299.72 | 5 | 11/12/70 |

Several loans were also made to the nursing home by Dr. Lowry individually, and by the trust for his children.[7] The first repayment of principal on the loans by petitioner to the nursing home was not made until the nursing home fully repaid these loans to Dr. Lowry and the trust. Prior to the time the repayment of principal began, the nursing home made regular payments of interest on the indebtedness to the hospital.

In January and March 1965, petitioner purchased certificates of deposit at the Sweetwater Valley Bank bearing interest at 4 percent. During 1967, 1968, and 1969, the passbook savings account rate at the bank was 4 percent; in 1970 and 1971, 4½ percent. In 1969, the 90-day passbook rate was 5 percent.

On January 12, 1967, the Sweetwater Valley Bank loaned the nursing home $60,076.97 at 5½-percent interest. This note was secured by a deed of trust on the nursing home property. On February 3, 1967, the bank made a personal 60-day loan to Dr. Lowry of 4½ percent.

The hospital received many referral patients from the nursing home. During the years 1967 through 1969 the hospital received $7,989.25 for hospital services rendered to patients at the nursing home. During the same years, the hospital received $14,746 for X-ray and laboratory services rendered to these patients.

In 1969 petitioner paid $4,130.08 toward the expenses of various nursing home patients who were not able to pay their bills in their entirety. Many of these patients had been transferred to the nursing home when other such facilities in the

---

[7] These loans were as follows:

| Date | Amount | Interest rate (percent) | Date paid | Payee |
|---|---|---|---|---|
| Oct. 9, 1967 _____ | $25,000.00 | 4 | 3/3/70 | Dr. Lowry |
| Nov. 13, 1967_____ | 10,000.00 | 4 | 9/11/69 | Dr. Lowry |
| Dec. 11, 1967 _____ | 5,000.00 | 4 | 12/12/68 | Lowry Children Trust |
| Apr. 12, 1968 _____ | 5,000.00 | 5 | 3/12/69 | Dr. Lowry |
| May 14, 1968 _____ | 12,450.00 | 5 | 7/10/69 | Dr. Lowry |
| June 12, 1968_____ | 10,000.00 | 5 | 1/18/69 | Dr. Lowry |
| July 12, 1968 _____ | 8,000.00 | 5 | 12/12/68 | Dr. Lowry |
| Sept. 11, 1968_____ | 1,614.04 | 5 | 2/10/69 | Dr. Lowry |
| Mar. 5, 1969_____ | 3,519.03 | *0 | 5/16/69 | Dr. Lowry |

*Interest paid $23.46

area were closed. The nursing home did not normally accept patients who could not pay their bills.

On November 18, 1963, petitioner was granted an exemption from Federal taxation as a charitable organization under section 501(c)(3). Petitioner's previous requests for exemption in 1956 and 1962 had been denied. On November 7, 1972, respondent notified petitioner by letter that a proposed revocation of its exempt status made on April 20, 1971, was final and that its exempt status was revoked effective January 1, 1967.

OPINION

The principal issue presented for decision is whether petitioner was a tax-exempt organization under section 501(c)(3). Under the relevant portion of section 501(c)(3), an organization, in order to be exempt, must be organized and operated *exclusively* for charitable purposes and *no part* of its net earnings may inure to the benefit of any private shareholder or individual. The cases emphasize that these requirements are conjunctive and the failure to meet either of them will result in the loss of the tax-exempt status. *Harding Hospital, Inc. v. United States,* 505 F.2d 1068 (6th Cir. 1974); *Stevens Bros. Foundation, Inc.,* 39 T.C. 93, 110 (1962), affd. 324 F.2d 633 (8th Cir. 1963), cert. denied 376 U.S. 969 (1964). The primary focus of the parties has been on the question whether any of the petitioner's net earnings inured to the benefit of private individuals.[8]

We note at the outset that the term "net earnings" as used in section 501(c)(3) includes more than the net profits as reflected on the organization's books. *Harding Hospital, Inc. v. United States, supra; Northwestern Municipal Assn. v. United States,* 99 F.2d 460 (8th Cir. 1938). "Net earnings" may inure to the benefit of an individual in a variety of ways, and not merely through the distribution of dividends. See *Founding Church of Scientology v. United States,* 412 F.2d 1197 (Ct. Cl. 1969), cert. denied 397 U.S. 1009 (1970); *General Contractor's Assn. of Milwaukee v. United States,* 202 F.2d 633 (7th Cir. 1953); *Chattanooga Auto. Club v.*

---

[8] Actually, the prohibition against private inurement of earnings appears redundant, since private inurement is clearly incompatible with being organized and operated "exclusively" for charitable purposes. For example, inurement of contributions or principal of a charitable organization would presumably be as fatal to exempt status as inurement of "net earnings." In the final analysis the two conjunctive "requirements" may simply be component parts of the broad concept "charitable."

*Commissioner,* 182 F.2d 551 (6th Cir. 1950); *Spokane Motorcycle Club v. United States,* 222 F.Supp. 151 (E.D. Wash. 1963).

After a careful examination of the record in the instant case, we have concluded that a portion of petitioner's net earnings inured to the benefit of Dr. Lowry and his family and that petitioner has thereby run afoul of the requirements for tax exemption under section 501(c)(3).

From 1965 to 1968 petitioner made substantial *unsecured* loans to the nursing home owned by Dr. Lowry and the trust for his children at below-market interest rates. While petitioner was earning 4 to 5 percent on its unsecured notes, the Sweetwater Valley Bank was receiving 5½ percent on a loan secured by a deed of trust on the nursing home's real property. Additionally, these unsecured loans, whereby most of petitioner's assets were invested in one relatively small and new business, were effectively subordinated in repayment to loans made to the nursing home by Dr. Lowry individually and the children's trust.

Petitioner made substantial unsecured loans at 4 percent to Dr. Lowry's nursing home from July of 1965 to July of 1966 that were not paid off until nearly 6 to 8 years later. During the interim, when Dr. Lowry's loans were being paid off on a priority basis, interest rates increased and petitioner lost interest income.[9] It is clear that the use of petitioner's funds inured to the benefit of Dr. Lowry by reducing his personal financial risk in the nursing home and by lowering the interest costs for the nursing home corporation.

Moreover, it cannot be said that being the principal source of financing for Dr. Lowry's nursing home was in petitioner's best interest. While the interest rate received by petitioner on the unsecured loans was roughly equivalent to the interest rate it was receiving or could have received on passbook deposits from the local bank at the time the loan was made, the nursing home loans represented a substantially greater risk. An equivalent risk, incurred for a similar duration, could be expected to produce higher earnings elsewhere. Petitioner could also have used these funds to improve the hospital service to the community.[10]

---

[9] When asked why the nursing home began paying back the principal on petitioner's loans in April 1970, the nursing home administrator replied: "there are some notes payable to Dr. Lowry and to the Lowry Trust and they had been paid and that's the first time we were able to pay off one of those notes completely."

[10] There is evidence in the record that petitioner's own facilities could have been improved in several respects with benefit to the community.

Petitioner made loans which were not in its own best interest, that we do not believe would have been made by parties on an arm's-length basis, and that resulted in a financial benefit to Dr. Lowry and the trust for his children.

In 1969, petitioner paid $4,130.08 to the private nursing home of Dr. Lowry and his children on behalf of patients who were otherwise unable to pay their bills. These payments to the nursing home, therefore, had the effect of preventing Dr. Lowry's nursing home from incurring what otherwise would have been bad debts. On reviewing the testimony in the light of the stipulated list of payments, we conclude this was done on an ad hoc basis and not pursuant to any general policy of the petitioner to make payments on behalf of the medically indigent prior to Dr. Lowry's acquisition of the nursing home. We believe the intent of the payment was the same as its effect. As owners of the nursing home corporation, Dr. Lowry and his children derived direct financial benefit from petitioner's payment.

However, our concern extends beyond these specifically identifiable instances of private inurement. Where a doctor or group of doctors dominate the affairs of a corporate hospital otherwise exempt from tax, the courts have closely scrutinized the underlying relationship to insure that the arrangements permit a conclusion that the corporate hospital is organized and operated *exclusively* for charitable purposes without any private inurement. See *Harding Hospital, Inc. v. United States, supra; Maynard Hospital, Inc.,* 52 T.C. 1006 (1969); *Sonora Community Hospital,* 46 T.C. 519 (1966), affd. 397 F.2d 814 (9th Cir. 1968); *Lorain Avenue Clinic,* 31 T.C. 141 (1958). The hospital was part and parcel of Dr. Lowry's medical practice and of his personal financial affairs. The two operations were so integrally interwoven in their daily operation that only the faintest outlines of a separable operating charity may be perceived, and these outlines fade so badly at critical points that the demarcation between Dr. Lowry's private medical practice and the operations of the hospital can no longer be discerned. The commingling of expenses and receipts, the sharing of employees and facilities, the joint occupancy of space, and the unified billing procedures under a joint letterhead proceeded to the point that in some instances expenses could not be specifically attributed to either the hospital or clinic but had to be allocated on a "reasonable basis."

On the entire record before us, including the control and dominance exercised by Dr. Lowry of the hospital's affairs, as well as the factors just enumerated, we do not believe that petitioner has borne its burden of proving that the integration of Dr. Lowry's private medical practice with the operations of the hospital did not result in the net earnings of the hospital inuring directly or indirectly to Dr. Lowry and his family.[11]

The remaining issue is whether petitioner's tax exempt status may be retroactively revoked for the taxable years ended prior to November 7, 1972. Respondent's authority to retroactively revoke rulings is found in section 7805(b):

SEC. 7805. RULES AND REGULATIONS.

(b) RETROACTIVITY OF REGULATIONS OR RULINGS.—The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

Respondent's retroactive revocation will not be disturbed unless respondent has abused his discretion. *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180 (1957). Respondent's action is normally appropriate where he has not been fully or correctly informed as to the material facts on which his ruling was based or there have been material changes in law or fact subsequent to the time the original ruling was issued. *Stevens Bros. Foundation, Inc.*, 39 T.C. 93, 110 (1962), affd. 324 F.2d 633 (8th Cir. 1963), cert. denied 376 U.S. 969 (1964).

We do not find respondent's action to be an abuse of discretion. In applying for exempt status, petitioner stated there was some sharing of personnel when an "emergency" arose, and some sharing of incidental expenses. In fact personnel were quite routinely shared on an extensive basis. Additionally, respondent would not have been alerted to the extensive nature of sharing medical expenses relating to drugs, pathology, and radiology.

At the time petitioner's exemption was granted it had made neither the series of loans to the nursing home, nor payments on behalf of its patients. Both of these events resulted in the

---

[11] Petitioners suggest that the clinic and hospital were in a symbiotic relationship, both benefiting from the more efficient utilization of personnel and facilities. We do not hold that such a relationship cannot exist under the terms of sec. 501(c)(3); we simply say that when it is predicated on the comprehensive integration of the two organisms manifested in this record, petitioner must offer convincing proof that the benefits were not unevenly distributed in favor of the private parties involved. Petitioner herein has not carried that burden.

inurement of a portion of petitioner's net earnings to a private individual.

Petitioner stated in its 1967, 1968, and 1969 returns that no creator, or contributor, or related party had borrowed any of its income or corpus. In its 1967 returns petitioner stated only that it had loaned $116,382.70 to Sweeter Valley Convalescent and Nursing Home, Inc., for the construction of its building. There was no other statement regarding the nature of these loans or the parties controlling the nursing home.

The $4,130.08 payment to the nursing home was not reported on petitioner's 1969 return, nor has petitioner shown that it otherwise informed respondent that such a payment was made.

In view of the fact that these circumstances were not fully disclosed to respondent, we do not find that he abused his authority in making a retroactive revocation of petitioner's exempt ruling.

Due to concessions,

*Decision will be entered under Rule 155.*